[Crim. No. 13411.   Second Dist., Div. Two.   June 13, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. RALPH THEODORE LIPSCOMB, Defendant and Appellant.

John B. Miller, Jr., for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Michael J. Smolen, Deputy Attorney General, for Plaintiff and Respondent.

FLEMING, J.—Must a physician conducting an examination for the purpose of civil commitment inform the person examined of the privilege against incrimination? This is the principal question in the appeal of Ralph Theodore Lipscomb from his commitment to the Director of Corrections for narcotic treatment at the Rehabilitation Center in Corona.

On 27 November 1966, Lipscomb, who appeared to be under the influence of a narcotic and showed external evidence of longtime hypodermic usage, was arrested by Officer Baker, advised of his rights, and taken to a police station. At the station he was again advised of his rights and questioned by Sergeant Hannon of the narcotic division. Thereafter Lipscomb was taken to the county jail infirmary, where an application was made for his admission under section 3100.6, Welfare and Institutions Code, as one believed to be addicted to narcotics or in imminent danger of becoming so addicted. A copy of the application was given to Lipscomb, who acknowledged its receipt in writing.[1] In the infirmary Lipscomb was

---

[1]The application included the following statement by Sergeant Hannon: "Prior to any statements given by the defendant, he was advised of his rights to an attorney, that anything he said could be used against him in a criminal proceeding, his right to remain silent and that if he was unable to afford an attorney, one would be supplied to him."

examined by a staff physician, Dr. Wetzel, and detained 48 hours by the infirmary for further examination. Dr. Wetzel thereafter declared he believed Lipscomb to be addicted to narcotics or in imminent danger of becoming so addicted, and a petition for Lipscomb's commitment was filed by the district attorney on 30 November 1966. The examinations, detentions, declarations, and petition were as prescribed by section 3100.6.

Lipscomb was next taken before the superior court, where counsel was appointed to represent him at the hearing on his commitment. At the hearing on 14 December 1966 Dr. Wetzel testified that appellant had a current narcotic addiction and an emotional dependency on heroin. The court ordered Lipscomb committed as an addict, and at a second hearing the following week, the court again ordered his commitment.

On appeal, Lipscomb contends the testimony of the examining physician should not have been received in evidence because (1) the testimony was based on privileged communications between doctor and patient, and (2) prior to his examination the examining physician did not advise Lipscomb of his right to remain silent and his right to counsel.

I

■ Commitment proceedings for narcotic addiction are special civil proceedings (*In re De La O,* 59 Cal.2d 128, 145-146 [28 Cal.Rptr. 489, 378 P.2d 793, 98 A.L.R.2d 705], cert. den. 374 U.S. 856 [10 L.Ed.2d 1076, 83 S.Ct. 1927]), and Lipscomb agrees that civil rules governing the admissibility of evidence should apply. ■ He concedes the doctor-patient privilege (former Code Civ. Proc., § 1881 subd. 4, now superseded by Evid. Code, §§ 990-1007) does not usually apply to examinations for commitment for narcotic addiction, but he argues that even in such examinations the privilege protects all statements of the patient given to the doctor while under treatment for illness. In conducting his examination in the present case, Dr. Wetzel found Lipscomb to be suffering from diabetes and from an arm infection, which ailments he proceeded to treat. Although at first Lipscomb was unwilling to talk about his use of narcotics, in a subsequent interview he answered Dr. Wetzel's questions on that subject.

We do not find persuasive the argument of privilege. The primary purpose of Lipscomb's admission to the county jail infirmary was to determine whether he was addicted to narcotics. Prior to his admission he had been advised in writing of that purpose and, as the statute requires, formally pre-

sented with a copy of the application. The record contains no suggestion of trickery or misrepresentation or equivocal conduct which might have led Lipscomb to believe he was entering the infirmary for medical treatment. Once Lipscomb had been admitted to the infirmary for examination, it was obviously beneficial to all concerned to have the examining physician also minister to his ailments. Such medical treatment in no way altered the purpose of Lipscomb's admission nor did it extend the scope of the examination into areas not authorized by the statute. Whether the doctor merely examines the subject, or examines and treats him, the doctor will only testify at the commitment hearing to matters relevant to the primary purpose of the examination. ■ Significantly, the new Evidence Code in section 1004 specifically excepts examinations for commitment from the doctor-patient privilege: "There is no privilege under this article in a proceeding to commit the patient or otherwise place him or his property, or both, under the control of another because of his alleged mental or physical condition." But, Lipscomb argues, Dr. Wetzel secured his confidence in the course of treating his ailments and as a consequence lulled him into giving information he would not have given had he been examined solely for the purpose of commitment. This argument concedes the propriety of the examination, but assumes that in a certain sense it was conducted fraudulently and therefore became tainted with illegality. The argument is related to Lipscomb's main contention, to which we now turn.

## II

Narcotic addiction commitment, Lipscomb observes, results in a loss of liberty. Hence, even though the proceeding is not criminal, its end-result has certain penal aspects which make it compulsory that an agent of the court, before eliciting information on which the court will rely if it determines to commit the alleged addict, comply with standards of criminal procedure by warning the person examined of the use to which information so obtained may be put. To support his contention he cites *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal. Rptr. 169, 398 P.2d 361], and *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

■ An extension of the *Dorado-Miranda* rules to civil commitment proceedings for all types of mentally and physically irresponsible persons, as the court observed of the identical contention in *People* v. *Hill,* 249 Cal.App.2d 453, 459 [57 Cal.Rptr. 551], would "do violence to the legislative pol-

icy upon which the law is based . . ." The extension is not needed to protect the person under examination from incrimination in the strict sense. The only crimes which it could be anticipated Lipscomb might disclose during such an examination and about which the examining physician might testify at the commitment hearing would be crimes involving the possession or use of narcotics. Against the admission of such disclosures in a criminal prosecution, Lipscomb was protected by the last paragraph of section 3100.6: "No evidence of violations of Sections 11500 [possession of a narcotic], 11530 [possession of marijuana] and 11721 [use of narcotics] of the Health and Safety Code found during the examination authorized by this section shall be admissible in any criminal proceeding against the person." ■ It is a commonplace of constitutional law that if protection against incrimination is complete, testimony may be compelled. (*Brown* v. *Walker*, 161 U.S. 591 [40 L.Ed. 819, 16 S.Ct. 644].) Where the possibility of incrimination is remote, a warning against incrimination would be an idle act and is not required. "The law neither does nor requires idle acts." (Civ. Code, § 3532.)

■ However, appellant argues that the constitutional protection against self-incrimination also protects the individual from the use of solicited statements in civil proceedings of a type which may result in confinement and which are therefore comparable in effect to criminal prosecutions. His basic argument is found in *In re Gault*, 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428], where the Supreme Court held that juvenile court procedure in state courts must satisfy the requirements of the due process clause of the 14th Amendment, including notice of the charges, right to counsel, right to confrontation and cross-examination, right to a transcript of the proceedings, and right to appellate review. The court declared that juvenile court proceedings which may result in commitment for delinquency must be regarded as criminal proceedings for purposes of the privilege against self-incrimination. (387 U.S. at p. 49 [18 L.Ed.2d at p. 558].) To support its conclusion the court pointed out that in a given case a juvenile court may relinquish jurisdiction over a juvenile to a criminal court, or it may commit a juvenile delinquent to an adult penal institution. (387 U.S. at pp. 49-51 [18 L.Ed.2d at pp. 558-559].) Appellant seems to argue that narcotic commitment proceedings are comparable to juvenile court proceedings, and therefore it is unconstitutional to use any statement obtained from a suspected addict who has not been specifically warned of his rights.

However, juvenile court proceedings bear a much closer resemblance to criminal proceedings than do narcotic commitment proceedings. First, juvenile court proceedings are usually concerned with conduct which when performed by an adult is classified as criminal. Narcotic addiction is not criminal conduct. (*Robinson* v. *California,* 370 U.S. 660 [8 L.Ed.2d 758, 82 S.Ct. 1417].) Second juvenile courts often relinquish jurisdiction to ordinary criminal courts. This is not possible in a narcotic commitment proceeding, for the prosecution of narcotic addiction as a crime is contrary to the 14th Amendment. (*Robinson* v. *California, supra.*) Third, punishment is not an end in the commitment of narcotic addicts (Welf. & Inst. Code, § 3000, ". . . such treatment shall be carried out for nonpunitive purposes . . ."), whereas a stated purpose of the law providing court supervision over juveniles is to secure the discipline of the delinquent. (Welf. & Inst. Code, §§ 502, 730, 734.) Because of the differences between juvenile court proceedings and narcotic addiction commitment proceedings we do not believe the decision in *Gault* automatically controls this case. Rather the dimension of the due process which applies to civil commitment proceedings is determined by the aim, method, and purpose of the particular commitment involved, not by the fact of commitment itself. (*In re Gault,* 387 U.S. at p. 49 [18 L.Ed.2d at p. 558, 87 S.Ct. 1428].)

█ Involved here are a procedure classified as civil and an aspect of that procedure designed to provide the court with expert medical opinion on the physical, mental, and emotional condition of the person about whom the court must make a finding of fact. Narcotic addiction commitment is one of a wide variety of civil procedures in which the courts rely on the help of examining physicians to make findings of fact which may lead to commitment. Among the procedures which employ examining physicians for this purpose are those which determine the status of mentally ill persons (Welf. & Inst. Code, § 5550 et seq.), of mentally deficient persons (§ 5590), epileptics (§ 5610), narcotic drug addicts (§ 5625), habit-forming drug addicts (§ 5650), inebriates (§ 5675), mentally disordered sex offenders (§ 5500), and mentally abnormal sex offenders (§ 5700). Each of these procedures is classified as civil, and each is purportedly designed for the primary benefit of a person who needs treatment or who needs protection from damaging influences. Were we to classify these procedures as

adversary in the criminal sense and require the person under examination to be treated as the accused in a criminal prosecution, we would necessarily discourage free communication between the examining physician and the person supposedly in need of treatment. While an accused in a criminal case may be prosecuted without his cooperation, normally a person cannot be examined to determine his physical, mental, and emotional state without some degree of cooperation between him and the examining physician. Communication is an important, undoubtedly in many instances an essential, part of such examination.

In essence, the case at bench presents two divergent aspects of due process of law, each of which is laudable and worthy of recognition. On the one hand, due process protects the individual against self-incrimination. On the other hand, due process demands the safeguard of comprehensive professional evidence before it will allow a court to commit a person civilly. Our task is to reconcile these aspects of due process if possible, or, if not possible in the present case, to determine which one carries the greater weight.

If we encourage the subject of an examination to talk we maximize the factual base on which the examining physician draws his conclusions and reaches an informed opinion, but at the same time we increase the possibility that the words of the person examined may substantially contribute to his subsequent commitment. Conversely, if we discourage the subject of the examination from communicating with the examining physician we limit the data on which the physician draws his conclusions, but we also reduce the possibility that the subject's admissions will strengthen a diagnosis in favor of commitment. It is apparent that there is a fundamental conflict between encouraging a person to talk and discouraging him from talking, a conflict so basic that full reconciliation of objectives in the present case is not feasible. We must, then, choose between objectives and determine which one is entitled to priority here.

Appellant argues that when individual liberty is the forfeit full protection of the individual's personality can only be achieved by bringing to civil commitment procedures all the safeguards of due process which apply in a criminal prosecution. We think this argument overstates the case. With equal validity it may be argued that more harm than good is likely to befall the individual who fails to communicate with his examining physician. If we discourage talk between these two when civil commitment is at stake, we make less information

available to the court passing on the commitment, and with less available information the court's decision—to commit or not to commit—will tend in some degree to be less reliable. From the point of view of the individual, an erroneous decision on civil commitment tends to operate to his long-term disadvantage. At least a powerful argument can be made to this effect. ■ And if we look at the matter from the point of view of society, any change in the reliability of the commitment process which increases the possibility that persons will be committed who should not be committed and persons discharged who should not be discharged operates to the prejudice of the social order. Obviously, the relative weight of these general considerations may be endlessly debated, but we think the controlling factor here lies in the specific declaration of policy of the Legislature that persons addicted to narcotics shall be treated civilly and nonpunitively for their own protection and for the protection of the public, a declaration which we think must be honored at face value. (Welf. & Inst. Code, § 3000.) Once we accept the declaration of the Legislature that these are civil proceedings and once we accept the legislative view that examining physicians bring to the court essential information without which the court should not act, we see no compelling reason to cut down the scope of that information by requiring a physician to advise a person under examination that he need not talk for fear of incrimination. Rather we think the appropriate solution to whatever legal dilemma is involved lies in the direction in which the Legislature has already moved, viz., to preserve the civil character of the examination and preclude the possibility of incrimination by making evidence discovered as a result of the examination inadmissible in related criminal prosecutions.

■ California's civil commitment procedures have heretofore been held constitutional. (*In re De La O,* 59 Cal.2d 128 [28 Cal.Rptr. 489, 378 P.2d 793, 98 A.L.R.2d 705], cert. den. 374 U.S. 856 [10 L.Ed.2d 1076, 83 S.Ct. 1927]), but because of *Gault* we have reviewed once more the comprehensive legislative pattern of civil commitment for narcotic addiction (Welf. & Inst. Code, § 3000 et seq.). We conclude that the constitutional requirements of due process have been satisfied by the procedure adopted, and that an extension of the *Dorado-Miranda* warnings to an examination by a physician for narcotic commitment purposes is not constitutionally compelled. We observe in the present case that Lipscomb was advised of his rights at the time of his arrest and again

advised of his rights at the police station. We hold a warning by the examining physician was not required. (*People* v. *Hill,* 249 Cal.App.2d 453 [57 Cal.Rptr. 551]; cf. *People* v. *Whelchel,* 255 Cal.App.2d 455, 459-462 [63 Cal.Rptr. 258.)

The order is affirmed.

Herndon, Acting P. J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 8, 1968. Peters, J., was of the opinion that the petition should be granted.