[Civ. No. 19359. Third Dist. Aug. 20, 1981.]

SUTTER SENSIBLE PLANNING, INC., et al., Plaintiffs and Appellants, v.
BOARD OF SUPERVISORS OF SUTTER COUNTY et al., Defendants and Appellants;
SUTTER TOMATO PRODUCTS, INC., Real Party in Interest and Respondent.

**814**

**COUNSEL**

Reed, Samuel & Remy, James S. Reed, Michael H. Remy and Tina A. Thomas for Plaintiffs and Appellants.

Darrell W. Larsen, County Counsel, Betty Wolfe, and Memering & DeMers for Defendants and Appellants.

Ellman, Passovoy & Burke Ellman and Howard N. Ellman for Real Party in Interest and Respondent.

**OPINION**

BLEASE, J.—Sutter Sensible Planning, Inc., and several affected individual property owners appeal from the denial of their petition for a writ of mandate seeking an order directing the Board of Supervisors of Sutter County to vacate its approval of an environmental impact report (EIR) and granting of a conditional use permit to construct a tomato paste processing plant on a parcel of land in the county. Plaintiffs also appeal from the denial of their petition for a declaration that the board violated the "open meeting" requirements of the Ralph M. Brown Act (Gov. Code, § 54950 et seq.) by conferring privately with the county counsel at one point during the meeting at which it approved the EIR and the conditional use permit. Defendants cross-appeal from the portion of the judgment denying their claim for reasonable attorney's fees pursuant to Government Code section 54960.5 (which permits such an award in unsuccessful actions based on the Brown Act where the court finds the action "clearly frivolous and totally lacking in merit"). We reverse the judgment insofar as it upheld the adequacy of the EIR, on the ground that substantial new information was included in its final version without affording a sufficient opportunity for public and agency input, but we affirm as to the denials of declaratory relief to plaintiffs and of attorney's fees to defendants.

FACTS

After real party in interest Sutter Tomato Products, Inc., applied for a conditional use permit to construct a tomato paste processing plant, a draft EIR, dated December 6, 1977, was prepared by the Sutter County Planning Department and circulated for public and agency comments.

According to the draft EIR, the proposed plant would process about 100 tons of tomatoes per hour, operating 24 hours a day during the 10- to 12-week tomato harvesting season. The operation would use very large quantities of water, an average of 1,000 to 1,200 gallons per minute during the processing season, and up to 1,800 gallons per minute during peak periods, which would be supplied by three deep wells. Approximately 2 million gallons of waste water per day would be used to irrigate pasture land on the 520-acre property (the plant itself would take up only 30 acres). Other areas of potential environmental concern included disposal of solid waste (primarily tomato pulp), disposal of domestic sewage, increased truck traffic, a "slight cooking aroma" which might be noticeable, and drainage. The economic impact of the plant (on employment, taxes, and growth) was also considered, as was its possible aesthetic impact.

Comments received from various agencies and one individual, along with the planning department's responses and a list of possible mitigating conditions, were incorporated into the "final" EIR[1] dated February 1978, in the form of an addendum.

On February 21, 1978, a public hearing was held before the planning commission on the application for a use permit and to allow comments on the final EIR. After hearing a number of comments criticizing and defending the EIR and the project itself, the commission voted to accept the EIR and to approve the use permit, subject to the mitigation conditions set out in the EIR and several more suggested at the hearing.

Some of the individual plaintiffs appealed from the planning commission's decision to grant a conditional use permit for the project to the Sutter County Board of Supervisors. At a hearing before the board on

---

[1]Although the title page of the report did not explicitly identify it as a final EIR, the director of the planning department so referred to it at the planning commission meeting at which it was accepted. Its format, consisting of the draft EIR, comments received thereon and the department's responses, comported with that prescribed for a final EIR by the state EIR Guidelines. (Cal. Admin. Code, tit. 14, § 15146.)

March 28, 1978, the EIR was criticized for failing to adequately consider the plant's effect on ground water levels, increased truck and rail traffic, the reliability of the project's system for disposing of waste water by "evapo-transpiration" on pasture land (opponents claimed the amount of land so devoted would not be sufficient, especially in years of greater-than-average rainfall), and quantities of residual pesticides in the waste water. The hearing was continued to April 4.

When the hearing on the use permit and EIR was reconvened, the board, upon the chairman's recommendation,[2] "referred [the EIR] back to the Planning Department for a redraft of the final report and appropriate processing," and continued the hearing to May 2, 1978, to consider the revision.

In accordance with the board's mandate, a "Revised Final Environmental Impact Report," dated April 1978, was prepared. In its own words, "[t]he revision respond[ed] to the testimony provided at public hearings on the issue by incorporating some testimony, adding information, answering questions raised and a fundamental reorganization of the material previously presented." Among the new information included therein were additional details regarding the quantities of pesticide residues to be expected in the tomato waste water, a more elaborate discussion of ground water availability and the projected impact of the plant on the water table, updated figures on the amount of motor vehicle traffic in the vicinity of the plant and a discussion of the effect on rail traffic and new figures on the proposed method of disposing of waste water, substituting Department of Water Resources estimates of evapo-transpiration potentials of pasture land in the Sacramento Valley

---

[2]The chairman indicated that his recommendation was in response to the "public input" described heretofore. He asked the board to "direct the planning department to rewrite the Final Environmental Impact Report to cover the following areas more completely:

"1. WATER—The impact on the ground water, the draw down caused by pumping, the possible contamination by the proposed waste water treatment, specific water disposal system, the number of gallons of waste water, the acreage involved in the disposal system, the difference between the spray disposal system and the flood disposal system, specific design information, water quality, specific level of fungi and herbinites (phonetic), failsafe provisions, actual evaporation and transpiration rate applicable to the property, set-back of waste disposal area from adjacent properties, flood consideration, sewage disposal other than processing water.

"2. TRAFFIC—(a) Rail traffic and its impact on the roads between Morehead Road and Yuba City, specific information on the departments' impact on Highway 20 at Morehead Road, Tarke Road and other roads in the area, the alternative access to the plant from Highway 20 and air pollution generated by the trucks."

during the tomato processing season for figures used in the previous EIR which were repudiated by their purported author.

On May 2, after listening to comments on the revised EIR and further debate on the issuance of a use permit, and after closing the hearing briefly to confer with the county counsel regarding plaintiffs' counsel's procedural defects in the compilation of the EIR, the board approved the EIR and certified it as being in compliance with the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.), with appropriate findings,[3] and issued the conditional use permit subject to the mitigation conditions, with minor modifications, proposed by the EIR.

Plaintiffs subsequently sought a writ of mandate in Sutter County Superior Court directing that the board's approval of the revised EIR and granting of the use permit be vacated. They appeal from the denial of their petition.

## DISCUSSION

### I

■ Plaintiffs contend that the "revised final" EIR should have been circulated for public and agency comment, since it contains significant new information. We agree that in such circumstances CEQA demands that an opportunity for comment be afforded. Consequently, we need not reach petitioners' additional argument that the EIR's discussion of the contemplated disposal of waste water from the plant by evapo-transpiration is inadequate.[4]

---

[3]The motion approved by the board declared in pertinent part that the "Environmental Impact Report consisting of the final EIR, which includes a draft EIR, dated February, 1978, and that amended by the revised final EIR dated April, 1978, has been filed which has been fully reviewed and considered by the board. And it is complete and complies with the California Environmental Quality Act and State and local guidelines enacted pursuant thereto. The possible impacts on the environment as set forth in said report are either adequately mitigated as set out hereinafter or outweighed by the economic and social benefits to be realized by approval of the project. These economic and social benefits include the additional tax revenue which will be realized by Sutter County should the project become a reality and the increased employment opportunities in this area of chronic unemployment...." (Cal. Admin. Code, tit. 14, §§ 15088, 15089.)

[4]The gist of plaintiffs' argument regarding the substantive adequacy of the brief is that the EIR fails to establish how much land will be available for flooding.

The EIR requirement is at the heart of CEQA. (*County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377].) An EIR is "'an informational document,' the purpose of which 'is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [(Pub. Resources Code, § 21061.)] [¶] The Supreme Court has observed that an EIR also serves 'to demonstrate to an apprehensive citizenry that the [responsible public] agency has in fact analyzed and considered the ecological implications of its action.' (*No Oil, Inc.* v. *City of Los Angeles* [(1974)] 13 Cal.3d 68, 86 [118 Cal.Rptr. 34, 529 P.2d 66]; see also *People* ex rel. *Dept. Pub. Wks.* v. *Bosio* (1975) 47 Cal.App.3d 495, 528 [121 Cal.Rptr. 375].) Indeed, full compliance with the EIR process has been recognized as necessary to enable the public to 'determine the environmental and economic values of their elected and appointed officials, thus allowing for appropriate action come election day should a majority of the voters disagree.' (*People* v. *County of Kern* (1974) 39 Cal. App.3d 830, 842 [115 Cal.Rptr. 67].)" (Fn. omitted.) (*Whitman* v. *Board of Supervisors* (1979) 88 Cal.App.3d 397, 405-406 [151 Cal. Rptr. 866]; see also Cal. Admin. Code, tit. 14, § 15011.5.)

The "detailed procedure" established by CEQA and its implementing state EIR Guidelines (Cal. Admin. Code, tit. 14, § 15000 et seq.) for preparation of the EIR was described in *City of Carmel-by-the-Sea* v. *Board of Supervisors* (1977) 71 Cal.App.3d 84, 93-94 [139 Cal.Rptr. 214]: "After the draft EIR has been completed, it must be distributed to interested parties and the public for their comments (Guidelines, § 15085, subd. (d)). The agency responsible for preparing the EIR must evaluate these comments and then prepare and certify the final EIR (Guidelines, § 15085, subds. (e), (f)). The final EIR must contain the draft EIR, the comments received on the draft ['either verbatim or in summary'], and the agency's response to 'significant environmental points raised in the review and consultation process' (Guidelines, § 15146, subd. (a)). The guidelines provide that these responses 'shall describe the disposition of significant environmental issues raised (e.g., revisions to the proposed project to mitigate anticipated impacts or objections). In particular *the major issues raised when the ... [a]gency's position is at variance with recommendations and objections raised in the comments must be addressed in detail giving reasons why specific comments and suggestions were not accepted, and factors of overriding*

*importance warranting an override of the suggestions.*' (Guidelines, § 15146, subd. (b) ....)"

Comments are an integral part of the EIR. (*Residents Ad Hoc Stadium Com.* v. *Board of Trustees* (1979) 89 Cal.App.3d 274, 286 [152 Cal.Rptr. 585].) The importance of the requirements of input from the public and other agencies, and of inclusion of the lead agency's responses thereto, was spelled out in *People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 841-842 [115 Cal.Rptr. 67]: "The policy of citizen input which underlies the act (*Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.* [(1972)] 27 Cal.App.3d 695, 704-705 [104 Cal.Rptr. 197]) supports the requirement that the responsible public officials set forth in detail the reasons why the economic and social value of the project, in their opinion, overcomes the significant environmental objections raised by the public. In *Silva* v. *Lynn* (1st Cir. 1973) 482 F.2d 1282, 1285, a case decided under the analogous National Environmental Policy Act (see *Friends of Mammoth* v. *Board of Supervisors* [(1972)] 8 Cal.3d 247, 260-261 [104 Cal.Rptr. 761, 502 P.2d 1049]; *County of Inyo* v. *Yorty*, [1973] 32 Cal.App.3d 795, 807 [108 Cal.Rptr. 377]), the court explained the policy thusly: 'Finally, and perhaps most substantively, the requirement of a detailed statement helps insure the integrity of the process of decision by precluding stubborn problems or serious criticism from being swept under the rug. A conclusory statement "unsupported by empirical or experimental data, scientific authorities, or explanatory information of any kind" not only fails to crystallize issues [citation] but "affords no basis for a comparison of the problems involved with the proposed project and the difficulties involved in the alternatives." [Citation.] Moreover, where comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. *There must be good faith, reasoned analysis in response.*' (Italics added.) (See also *Environmental Defense Fund, Inc.* v. *Coastside County Water District, supra,* 27 Cal.App.3d 695, 704-705, 708 [104 Cal.Rptr. 197]; *Portland Cement Association* v. *Ruckelshaus* (1973) 486 F.2d 375, 392-394 [158 App.D.C. 308].) Only by requiring the County to fully comply with the letter of the law can a subversion of the important public purposes of CEQA be avoided ...." (39 Cal. App.3d at pp. 841-842; see also *Russian Hill Improvement Assn.* v. *Board of Permit Appeals* (1974) 44 Cal.App.3d 158, 171-172 [118 Cal.Rptr. 490].)

In this case, the draft EIR was properly circulated for comment. After a public hearing[5] at which numerous criticisms of the "final EIR" were made, the Sutter County Board of Supervisors determined that it should be "redraft[ed]" and "appropriate[ly] process[ed]," two of the supervisors expressing the opinion that the EIR before them was "inadequate" and could not survive judicial review. The "revised final" EIR was thereupon prepared and made available to the public, the trial court found, "promptly" after April 20, 1978, at most 12 days before the board meeting at which it was finally approved. There is nothing in the record to indicate that it was circulated to responsible public agencies.

A 1977 opinion of the Attorney General takes the position that a public agency which has already certified an EIR must nevertheless "reopen[]" the "CEQA process" if it is established at a subsequent hearing on the project itself that the EIR is inadequate. (60 Ops.Cal. Atty.Gen. 335, 339-341 (1977).) The opinion, which we find persuasive, would appear a fortiori to require "reopen[ing]" where the inadequacy of the EIR is shown at a public hearing which is itself a part of the EIR process. Although neither the statutes nor the state guidelines address the precise question of what procedures are appropriate in such a situation, we find guidance in the requirements set out for "subsequent" EIR's (Pub. Resources Code, § 21166; Cal. Admin. Code, tit. 14, §§ 15067, 15067.5) and in "analogous" federal cases (see *People* v. *County of Kern, supra*, 39 Cal.App.3d at p. 841).

Public Resources Code section 21166 provides: "When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available." Reading this provision in light of

---

[5]The state guidelines implementing CEQA encourage, but do not require, the holding of public hearings as part of the EIR process. (Cal. Admin. Code, tit. 14, §§ 15164, 15165.)

section 21167, which sets out the procedure for attacking an EIR which does not comply with the requirements of CEQA, the Attorney General correctly concluded that section 21166 contemplated an adequate initial EIR and did not preclude a subsequent or supplemental EIR from being prepared where the initial EIR was inadequate (60 Ops.Cal.Atty. Gen. at pp. 340-341.) Thus, in *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist., supra,* 27 Cal.App.3d at pages 708-709, the court ordered that a supplemental EIR be prepared to cure inadequacies in an EIR. Significantly, the guideline governing EIR supplements requires them to be circulated and subjected to public review in the same manner as the initial EIR. (Cal. Admin. Code, tit. 14, § 15067.5.)

A number of federal decisions have held that supplements to environmental impact statements (EIS's) must be circulated. "Otherwise the process becomes a useless ritual, defeating the purpose of NEPA [National Environmental Protection Act], and rather making a mockery of it." (*Natural Resources Defense Council* v. *Callaway* (2d Cir. 1975) 524 F.2d 79, 92.) The importance of circulating such a supplement for comment was explained in *Appalachian Mountain Club* v. *Brinegar* (D.N.H. 1975) 394 F.Supp. 105, 121-122: "There cannot be responsible decision-making when data appears in the final EIS without being subject to the critical evaluation that occurs in the draft stage. There are two dangers that can occur when information appears in the final EIS for the first time: (1) the ultimate decision-makers will believe that there is no controversy due to the lack of critical comment; and (2) objective errors without being red-flagged would go unnoticed. It is for these reasons that [an agency regulation] provides: 'A supplemental statement is to be processed in the same manner as a new environmental statement.' (23 C.F.R. § 1.38, p. 20 (1974).) [¶] Supplemental information, which has not been processed in the same manner as a draft EIS, cannot resurrect a deficient impact statement. [Citation.] The failure to include [the information] in the draft impact statement denied the plaintiffs the 'opportunity to test, assess, and evaluate the data and make an informed judgment as to the validity of the conclusions to be drawn therefrom.'" (Fn. omitted.) (See also *I-291 Why? Association* v. *Burns* (2d Cir. 1975) 517 F.2d 1077, 1081; *State of Cal.* v. *Bergland* (E.D.Cal. 1980) 483 F.Supp. 465, 495; *Essex Cty. Preservation Ass'n* v. *Campbell* (1st Cir. 1976) 536 F.2d 956, 960-961; *Natural Resources Defense Council, Inc.* v. *Morton* (D.D.C. 1972) 337 F.Supp. 170, 172.) While recirculation is not required where the supplement merely clarifies or amplifies (*Environmental Defense Fund, Inc.* v.

*Froehlke* (W.D.Mo. 1973) 368 F.Supp. 231, 236-237, affd. *sub. nom.,* *Environmental Defense Fund, Inc.* v. *Callaway* (8th Cir. 1974) 497 F.2d 1340), or makes insignificant modifications in (*Woida* v. *United States* (D.Minn. 1978) 446 F.Supp. 1377, 1384), an adequate EIR, where "substantial changes" in the EIR are made, recirculation is required. (*State of Alaska* v. *Carter* (D.Alaska 1978) 462 F.Supp. 1155, 1164.)

Here, the failure to circulate the "revised final" EIR after the board found it necessary to have the original "final" EIR redrafted to respond to significant public comments at the public hearing renders it procedurally inadequate. The public had at most 12 days to review the revision, whereas the state guideline concerned with the provision of "adequate time for other public agencies and members of the public to review and comment on an EIR" says that not less than 30 days should be allowed for public review of a draft EIR and not less than 45 days where any state agency is a responsible agency. (Cal. Admin. Code, tit. 14, § 15160.) Although a shorter period may indeed be adequate for review of a supplemental EIR (see *State of Alaska* v. *Carter, supra,* 462 F.Supp. at p. 1162 [25-day comment period authorized by the Council on Environmental Quality pursuant to regulations was sufficient for EIS supplement]), there is no finding in the present case that the time was adequate for public review. In any event, the "revised final" EIR was not circulated to other public agencies to permit them to comment on the significant additions. We realize that in ordering the board to vacate its approvals of the EIR and the project and requiring circulation of the revision for purposes of comment and review, we force further delay of the project; however, we may not permit such considerations to eviscerate the fundamental requirement of public and agency review, that is the strongest assurance of the adequacy of the EIR. (*Natural Resources Defense Council, Inc.* v. *Morton, supra,* 337 F.Supp. at p. 172.)

## II

Plaintiffs contend that the trial court erred in refusing to declare[6] that the board violated the Ralph M. Brown Act (Gov. Code,

---

[6]Plaintiffs apparently concede that violation of the Brown Act does not void the action subsequently taken by the board. (See *Griswold* v. *Mt. Diablo Unified Sch. Dist.* (1976) 63 Cal.App.3d 648, 656-658 [134 Cal.Rptr. 3]; *Adler* v. *City Council* (1960) 184 Cal.App.2d 763, 774 [7 Cal.Rptr. 805].) They argue, however, that declaratory relief is an appropriate remedy to remind the board of its duty to conduct its

§§ 54950-54961) in recessing the May 2 public hearing briefly to receive legal advice from the county counsel regarding plaintiffs' counsel's presentation, made earlier at the hearing, in which he alleged that the "revised final" EIR suffered from several procedural and substantive defects. The trial court found that the presentation contained "what members of the board thought was an implied threat of litigation," and that such an inference was reasonable, especially in light of the board's awareness of a previous successful suit by some of the plaintiffs to set aside a use permit for the same property. Based upon the foregoing findings, the trial court concluded that the board's "executive session" for the sole purpose of receiving legal advice did not violate the Brown Act. We agree.

The Brown Act does not explicitly except attorney-client communications between a public agency and its counsel from the requirement that "all meetings" be "open and public." (Gov. Code, §§ 54953, 54957.) In *Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41 [69 Cal.Rptr. 480], however, we held that the Brown Act does not abrogate the statutory policy, expressed in the evidentiary privilege of attorney-client confidential communications (see Evid. Code, §§ 952-954), assuring the opportunity for private legal consultation, by public as well as private clients. (*Id.*, at p. 55.) We there observed:

"Government should have no advantage in legal strife; neither should it be a second-class citizen. We reiterate what we stated in the supersedeas aspect of this suit, *Sacramento Newspaper Guild* v. *Sacramento County Board of Supervisors* [(1967)] 255 Cal.App.2d [51,] at page 54: 'Public agencies face the same hard realities as other civil litigants. An attorney who cannot confer with his client outside his opponent's presence may be under insurmountable handicaps. A panoply of constitutional, statutory, administrative and fiscal arrangements covering state and local government expresses a policy that litigating public agencies strive with their legal adversaries on fairly even terms. We need not pause for citations to demonstrate the obvious. There is a public entitlement to the effective aid of legal counsel in civil litigation. Effective aid is impossible if opportunity for confidential legal advice is banned.' [¶] Settlement and avoidance of litigation are particularly sensitive activities, whose conduct would be grossly confounded, often made impossible, by undiscriminating insistence on open lawyer-client

---

deliberations in public and so vindicate the "salut[a]ry democratic princip[le]" of the Brown Act.

conferences. In settlement advice, the attorney's professional task is to provide his client a frank appraisal of strength and weakness, gains and risks, hopes and fears. If the public's 'right to know' compelled admission of an audience, the ringside seats would be occupied by the government's adversary, delighted to capitalize on every revelation of weakness. A lawyer worth his salt would feel *a sense of treachery* in disclosing that kind of appraisal. (8 Wigmore [on Evidence (McNaughton rev. 1961)] § 2291, p. 553.) To him its conduct in public would be shocking, unprofessional, unthinkable. He would prefer to fight the lawsuit to its bitter end. Frustration would blunt the law's policy in favor of settlement, and financial imprudence might be a compelled path." (Fn. omitted.) (263 Cal.App.2d at pp. 55-56.)

Relying on our statement in *Sacramento Newspaper Guild* that, because of its effect of suppressing public access, the protections given a public agency's confidential communications must be "strictly construed" (*Id.*, at p. 58), plaintiffs argue that in the absence of actual pending litigation, the board was not entitled to seek legal advice in private. We spoke there, though, of the importance of the attorney's ability to give his public client a "frank appraisal" of the strengths and weaknesses of its position in regard to both "[s]ettlement *and avoidance of litigation.*" (Italics added.) (*Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs., supra*, 263 Cal.App.2d at p. 56.) While "[n]either the [public agency's] attorney's presence nor the *happenstance* of *some kind* of lawsuit may serve as the *pretext* for secret consultations whose revelation will not injure the public interest" (italics added; *id.*, at p. 58), this was not the case here. The board had been told by an attorney representing several plaintiffs (some of whom had sued the county successfully once before in connection with the same property) that the EIR before it had a number of significant defects which precluded the board from legally approving it or the project. In these circumstances, in the face of what it reasonably inferred was a threat of a quite *specific* lawsuit, the board needed no pretext for deciding to confer with the county counsel.

### III

Defendants have cross-appealed from the trial court's refusal to award them attorney's fees under Government Code section 54960.5, which authorizes the award of such to a prevailing defendant where the court finds the action to have been "clearly frivolous and totally lacking in merit." In light of our observations in *Sacramento Newspaper Guild*

v. *Sacramento County Bd. of Suprs., supra*, 263 Cal.App.2d 59, that the protection afforded public agencies in their attorney-client communications is subject to special limitation, and that "[t]o attempt a generalization embracing the occasions for genuine confidentiality would be rash" (*id.*, at p. 58), we are not inclined to disturb the trial court's implicit, essentially factual determination that plaintiffs' request for declaratory relief was not "clearly frivolous."

### DISPOSITION

The judgment is reversed insofar as it upholds the adequacy of the "revised final" EIR, but in all other respects is affirmed. Costs are to be borne by defendants.

Regan, Acting P. J., and Phillips, J.,* concurred.

A petition for a rehearing was denied September 15, 1981, and the petition of defendants and appellants and real party in interest and respondent for a hearing by the Supreme Court was denied October 14, 1981.

---

*Assigned by the Chairperson of the Judicial Council.