A01A0138. CLAXTON ENTERPRISE v. EVANS COUNTY BOARD
OF COMMISSIONERS.
(549 SE2d 830)

Ellington, Judge.

A newspaper, the Claxton Enterprise ("the Enterprise"), sued the Evans County Board of Commissioners ("the Board") alleging violations of the Georgia Open Meetings Act, OCGA § 50-14-1 et seq. The Enterprise sought to enjoin future violations of the Act, to obtain meeting records, to void any action taken in violation of the Act, and to recover attorney fees and costs of litigation. Following an evidentiary hearing, the superior court ruled that one of two closed meetings was closed in violation of the Act and awarded the Enterprise $1,500 in attorney fees. The Enterprise appeals contending both meetings were improperly closed; the Board's minutes and affidavits supporting its reasons for closing the meetings were improper, insufficient, or untimely filed; certain discussions pertaining to the decision to close the meetings were not held in public, as required by law; and the court's award of attorney fees was both insufficient and contrary to law. For the reasons that follow, we affirm the judgment below in part and reverse in part and remand for further proceedings consistent with this opinion on the issue of attorney fees and costs of litigation.

A trial court's factual findings in a nonjury trial shall not be set aside unless clearly erroneous. OCGA § 9-11-52 (a); *Mut. Ins. Co. of N.Y. v. Dublin Pub*, 190 Ga. App. 94, 95 (378 SE2d 497) (1989). The "clearly erroneous" test is the "any evidence" rule. If there is any evidence to support the findings of fact by a trial court sitting without a jury, then the appellate court affirms without interference with or disturbing such factfindings. *Kimbrell v. Effingham Bd. of Tax Assessors*, 191 Ga. App. 544, 546 (382 SE2d 388) (1989). We construe the evidence in favor of the judgment. *Mills v. Berlex Laboratories*, 235 Ga. App. 873, 875 (510 SE2d 621) (1999). Viewed in this light, the record reveals the following facts.

On July 1, 1999, the Board held a budget meeting. The primary item on the agenda was the Evans County Recreation Commission budget for the fiscal year 2000. The budget included a line item allocation of $6,000, the first installment in a proposed payment plan to

compensate Recreation Director Danny Swain for accrued leave benefits. Swain's accrued leave had been listed as a liability against the county for many years and was a matter of public record. When this matter came before the Board, Chairman Marty Todd invoked the attorney-client exception to the Open Meetings Act and closed the meeting to discuss "probable litigation concerning a recreation employee." Enterprise publisher, Mitchell Peace, and other members of the public were present at the meeting. Peace objected to the closed session. Peace testified, and the Board concedes, that the county attorney was not present for the closed session. There is no evidence that Swain had undertaken any legal action against the county as of July 1, 1999. Further, Swain testified that as of that date he had not even consulted an attorney. He reportedly told the county administrator, however, that if the Board failed to pay him, he would use whatever legal means necessary to get compensated. The official minutes of this meeting and an affidavit identifying the reasons for closing it were not filed until August 3, 1999.

The Board's next regularly scheduled meeting was held on July 6, 1999. During the time between this meeting and the July 1 meeting, the county administrator called each of the Board members to tell them the chairman had misstated his reasons for closing the July 1 meeting, that it should have been closed for personnel reasons rather than to discuss potential litigation, and that the chairman would be issuing a statement to that effect on July 6. At the July 6 meeting and without any discussion, Chairman Todd explained that the Board "mistakenly stated" that the July 1 meeting was closed to discuss potential litigation. "[W]e should have stated it [was] for personnel reasons." At the end of the July 6 meeting, the Board released a signed affidavit stating that the July 1 meeting had been closed to discuss personnel matters pertaining to a "county officer or employee." As the lower court found and as the Board now concedes, Swain, as an employee of the Evans County Recreation Authority, a separate governmental entity, is not an Evans County employee within the meaning of OCGA § 50-14-3 (6).

On July 6, 1999, with the county attorney present, the Board again entered a closed session to discuss whether or not to pay Swain. Prior to entering the closed session, Chairman Todd announced: "So at this time we need to go into executive session to discuss personnel concerning the recreation department." Again, Peace objected, arguing that Swain's compensation was not a personnel matter, but a budget matter. Commissioner Moore agreed, pointing out that Swain's compensation had "been noted in the budget." At that point, Chairman Todd called for a five-minute break. During that break, a few of the commissioners spoke with the chairman, and, according to the county administrator, the chairman "may have

taken some advice" on whether to close the meeting. Immediately after the break, and without any further discussion, the chairman called for a motion to go into closed session. A commissioner made the motion, it was seconded, and the public was ejected from the meeting. In an affidavit dated July 12, 1999, the Board stated that this meeting was closed for two reasons: to discuss a personnel matter involving a county employee and to discuss potential litigation with the county attorney. The affidavit was not recorded until August 3, 1999.

Based upon this evidence, the trial court concluded that the July 1 meeting was improperly closed in violation of the Act. The Board does not contest this. Also, the trial court found that the July 6 meeting was properly closed because even though Swain was not a county employee, the matter for discussion fell within the attorney-client exception, OCGA § 50-14-2 (1). The court determined that the "statements and circumstances surrounding [Swain's] controversy, when reasonably evaluated, did in fact present a realistic threat of litigation." The court denied the Enterprise's remaining claims without discussion. Following a separate hearing on sanctions, the court awarded the Enterprise $1,500 in attorney fees and costs of litigation. Although the Enterprise asked for $9,699.88 in fees and costs, the court declined to award that much because it determined the Board did not act in "bad faith" in closing the July 1 meeting.

1. As a preliminary matter, the Board argues this appeal is moot because it sent the Enterprise a check for $1,500 to satisfy the award of attorney fees and the Enterprise cashed it. The Enterprise later renounced the payment and mailed the funds back to the county.

An appeal may be dismissed "[w]here the questions presented have become moot." OCGA § 5-6-48 (b) (3). "[T]he voluntary payment of the judgment *by an appellant* renders moot the issues sought to be determined on appeal." (Citations omitted; emphasis supplied.) *Imperial Body Works v. Nat. Claims Svc.*, 158 Ga. App. 241, 243 (2) (279 SE2d 534) (1981). Of course, here, the appellee made the payment, not the appellant. The Board argues that the Enterprise's acceptance of the $1,500 shows its implied acceptance of the attorney fees award. As we have held:

> As a general rule, any voluntary act by a party, with knowledge of the facts, by which he expressly or impliedly recognizes the validity and correctness of a judgment against him, will operate as a waiver of his right to bring error to reverse it, as where he receives affirmative relief under the judgment or takes a position inconsistent with his right of review.

(Citations and punctuation omitted.) *J & F Car Care Svc. v. Russell*

*Corp.*, 166 Ga. App. 888 (305 SE2d 504) (1983). On appeal, the Enterprise asserts that the attorney fees award was inadequate and contrary to law. Under these circumstances, accepting the $1,500 payment neither expressly nor impliedly recognizes the court's "correctness" when an equally likely alternate inference exists: the Enterprise was accepting a partial payment. See *Crawford v. Andrew Systems*, 39 F3d 1151, 1153 (11th Cir. 1994). Further, the attorney fees issue is collateral to the main judgment appealed: whether the court erred in ruling that the July 6 meeting was properly closed. Consequently, the Enterprise's acceptance of the attorney fees payment does not render the appeal moot.

2. The trial court found that the Board's July 6 meeting was properly closed to discuss "potential litigation" under OCGA § 50-14-2, the attorney-client exception to the Open Meetings Act. The trial court held that Swain's promise to "take all legal means necessary" to recover the money the county owed him constituted a "realistic threat of litigation" warranting a closed meeting under that Code section. We disagree.

The Georgia Open Meetings Act requires, except as otherwise provided by law, that "all meetings as defined in [OCGA § 50-14-1 (a) (2)] shall be open to the public." OCGA § 50-14-1 (b). This provision applies to all governmental agencies, including every county and every county or municipal department, agency, board, bureau, commission, or authority. OCGA § 50-14-1 (a) (1) (B), (C). The Act applies to all "meetings" of such entities and defines meeting to include: "the gathering of a quorum of the members of the governing body of an agency or of any committee . . . at a designated time and place . . . at which official action is to be taken." OCGA § 50-14-1 (a) (2). A government entity may close such a meeting *only* if a specific statutory exception applies. See OCGA §§ 50-14-2; 50-14-3; 50-14-4. The Open Meetings law "was enacted in the public interest to protect the public — both individuals and the public generally — from 'closed door' politics and the potential abuse of individuals and the misuse of power such policies entail." *Atlanta Journal v. Hill*, 257 Ga. 398, 399 (359 SE2d 913) (1987). To further this purpose, the Act, including its default position that meetings be open, must be construed broadly, and any exceptions to the Act, including those pertaining to closed meetings, must be narrowly construed. Id.; *Kilgore v. R. W. Page Corp.*, 261 Ga. 410, 411 (3) (405 SE2d 655) (1991).

The attorney-client exception to the Act provides as follows:

(1) The attorney-client privilege recognized by state law to the extent that a meeting otherwise required to be open to the public under this chapter may be closed in order to consult and meet with legal counsel pertaining *to pending or*

*potential litigation, settlement, claims, administrative pro-
ceedings, or other judicial actions brought or to be brought by
or against the agency* or any officer or employee or in which
the agency or any officer or employee may be directly
involved; provided, however, the meeting may not be closed
for advice or consultation on whether to close a meeting; and
(2) Those tax matters which are otherwise made confidential
by state law.

(Emphasis supplied.) OCGA § 50-14-2.

In this case, Swain only threatened to sue. In our litigious soci-
ety, a governmental agency always faces some threat of suit. To con-
strue the term "potential litigation" to include an unrealized or idle
threat of litigation would seriously undermine the purpose of the Act.
Such a construction is overly broad. Construing OCGA § 50-14-2 (1)
narrowly, we hold that a meeting may not be closed to discuss poten-
tial litigation under the attorney-client exception unless the govern-
mental entity can show a realistic and tangible threat of legal action
against it or its officer or employee, a threat that goes beyond a mere
fear or suspicion of being sued. A realistic and tangible threat of liti-
gation is one that can be characterized with reference to objective
factors which may include, but which are not limited to, (1) a formal
demand letter or some comparable writing that presents the party's
claim and manifests a solemn intent to sue, see *Bd. of Ed. v. Freedom
of Information Comm.*, 217 Conn. 153, 160-163 (585 A2d 82, 86-87)
(1991); (2) previous or pre-existing litigation between the parties or
proof of ongoing litigation concerning similar claims, see *Sutter Sen-
sible Planning v. Bd. of Supervisors*, 122 Cal. App.3d 813, 825-826
(176 Cal. Rptr. 342, 349) (1981); or (3) proof that a party has both
retained counsel with respect to the claim at issue and has expressed
an intent to sue, see *Star Tribune v. Bd. of Ed.*, 507 NW2d 869, 872
(Minn. App. 1993). This list is not intended to be exhaustive but
merely illustrative of circumstances that a trial court may consider,
in the exercise of its discretion, that take the threat of litigation out
of the realm of "remote and speculative" and into the realm of "realis-
tic and tangible."

In this case, Swain had not hired a lawyer, sent a demand letter,
filed a lawsuit, or undertaken any of the traditional steps leading up
to litigation or to the formal assertion of his claim. Swain's comment
that he would use whatever legal means available to him was an idle
threat, a statement that, standing alone, was insufficient to justify
closing a meeting under OCGA § 50-14-2. Finally, although the
Board contends the meeting was closed to discuss potential litigation,
the record does not even support this claim. Instead, the real sub-
stance of the closed meeting was whether Swain had actually earned

30 years of accrued leave under current personnel policies. See *Floyd County Bd. of Ed. v. Ratliff*, 955 SW2d 921, 924 (Ky. 1997). For these reasons, we must reverse the court's determination that the Board properly closed this meeting.

3. The Enterprise also contends that the Board violated the Act when it met privately through a series of telephone calls to change the announced reason for closing the July 1, 1999 meeting and when it deliberated during a five-minute break to determine whether to enter a closed session on July 6, 1999.

The record shows that the county administrator, after speaking with the chairman, contacted each member of the Board over a period of time to discuss amending the stated reasons for closing the July 1, 1999 meeting and that none of the members objected to the amendment. During the July 6 meeting, without any public deliberation or vote, the commissioner issued a statement announcing that "we," the Board, erred in stating the reasons for closing the July 1 meeting. Implicit in this set of facts is that sometime before the call of the July 6 meeting, a quorum of the Board discussed official business and agreed to take official action. It is clear to us that because the Board engaged in a deliberative process and voted on official business, a "meeting," as that term is used in common parlance, occurred. However, because that meeting did not fall within the Act's definition of a meeting, the Board did not violate the letter of the law. The legislature has chosen to define a meeting as one which occurs "at a designated time and place." OCGA § 50-14-1 (a) (2). Because this meeting occurred between the county administrator and the commissioners individually, over a period of time, and at no particular place, the trial court properly found that the Board did not violate the Act by conducting a closed meeting to amend its reason for closing the July 1 meeting.

This holding is not intended to imply that a telephonic meeting can never violate the Act. Although a meeting is required to be open only when a quorum of a governing body or its agents have gathered at a designated time and place to take official action, such a gathering can be realized through virtual as well as actual means. The quorum does not have to be gathered in a physical space. In this digital age, we recognize that meetings may be held in ways that were not contemplated when the Act was initially drafted. The General Assembly passed the Open Meetings Act to ensure that the people's business is conducted in an open and accessible manner. The Act is construed broadly to ensure public access to and input into the deliberative process and to foster confidence in our leaders and the decisions they make. Thus, a "meeting," within the definition of the Act, may be conducted by written, telephonic, electronic, wireless, or other virtual means. See, e.g., *Del Papa v. Bd. of Regents*, 114 Nev.

388, 391-392 (956 P2d 770, 773) (1998) (mail poll constituted a meeting); 1985 Nev. Op. Atty. Gen. 90 (presence may be actual or constructive). A designated place may be a postal, Internet, or telephonic address. A designated time may be the date upon which requested responses are due.

Further, the evidence adduced below was insufficient to show that the Board conducted a meeting in violation of the Act during the five-minute break on July 6. We feel compelled, though, to reiterate that the Act does not permit a meeting to "be closed for advice or consultation on whether to close a meeting." OCGA § 50-14-2 (1). Moreover, the procedure that an agency must follow to close a meeting is plainly set out in OCGA § 50-14-4. Although we cannot determine if a closed meeting took place in this case to discuss whether to conduct a closed session, we do find that the testimony adduced reveals a cavalier attitude on this issue. For example, the county administrator testified that the Board did not have a public discussion on whether to go into closed session on July 6 because "we feel like we have a — an issue of [being] able to close a public meeting . . . and not let the public, you know, discourage you from what you feel is the right thing to do." It does not logically follow that the decision to close a meeting should be made in private just because closing a meeting is the "right thing to do" or because the public is strongly encouraging a position or action the agency believes is ill-advised. The Act was intended to hold governmental agencies and their members accountable to the public for the decision to enter a closed session, no matter how vocal, annoying, or discouraging that public may be.

4. The Enterprise also claimed the Board's affidavits pertaining to the closed sessions were insufficient and untimely filed. OCGA § 50-14-4 (b), which became effective on July 1, 1999, provides that when a meeting is closed, the chairperson "shall execute and file with the official minutes of the meeting a notarized affidavit stating under oath that the subject matter of the meeting or the closed portion thereof was devoted to matters within the exceptions provided by law and identifying the specific relevant exception." Id. The official minutes must be recorded and made available for public inspection as soon as they are officially approved, "but in no case later than immediately following the next regular meeting of the agency." OCGA § 50-14-1 (e) (2).

In this case, the Board executed form affidavits that simply said "the subject matter of the closed portion of the meeting was devoted to the following matter(s) within the exceptions provided in the open meetings law." That statement was followed by a checklist of the four potentially applicable statutory exceptions. Although the use of such pre-printed, multi-choice form affidavits does not violate the Act, courts should review form affidavits with heightened scrutiny

because they conveniently leave open the possibility that an affiant could check every box that might apply and later say, "I inadvertently checked the wrong exception." An affidavit should be treated with more solemnity and care, especially one which is used to inform the public in compliance with the Open Meetings Act.

Although the affidavits are legally sufficient, it does not appear that the Board timely recorded the affidavit and minutes from the July 1 meeting. The affidavit must be filed with the official minutes. OCGA § 50-14-4 (b). The Board waited to record the minutes until August 3, 1999, even though a regularly scheduled meeting was held on July 6. The Board argues that they did not have to record the minutes until August 3, 1999, because the minutes were not "made official" until then. However, the Board fails to note that under the plain language of OCGA § 50-14-1 (e) (2), the minutes must be recorded as soon as they are made official, *"but in no case later than immediately following the next regular meeting of the agency,"* which, in this case, means the July 1 minutes must have been filed by July 6. (Emphasis supplied.) The fact that the Board argues it made its affidavit available to the Enterprise earlier than the official filing date is of no consequence. The Act requires that the minutes and affidavits be timely recorded and made open to public inspection so that the general public knows when and where to find an official accounting of the business that transpired. The trial court erred in failing to find that the Board's failure to timely file the affidavit and minutes pertaining to the July 1 meeting constituted an additional violation of the Act.

5. The court found that the Board closed the July 1 meeting without "legal justification" and that an award of reasonable attorney fees and costs of litigation was authorized under OCGA § 50-14-5 (b). The court awarded $1,500 of the $9,699.88 requested because "[a]lthough the evidence shows there was no bad faith on the part of the Commission, the fact remains that the public was wrongfully excluded in violation of the law." Because the trial court's analysis of the attorney fees issue does not comport with that required in OCGA § 50-14-5 (b), we vacate the award and remand this case for proceedings on this issue consistent with this opinion.

A court must award attorney fees under OCGA § 50-14-5 (b) only if it finds that an agency acted "without substantial justification" in failing to comply with the Open Meetings Act.

> In any action brought to enforce the provisions of this chapter in which the court determines that an agency acted *without substantial justification* in not complying with this chapter, the court *shall*, unless it finds that special circumstances exist, assess in favor of the complaining party reasonable attorney's fees and other litigation costs reasonably

incurred. Whether the position of the complaining party was substantially justified shall be determined on the basis of the record as a whole which is made in the proceeding for which fees and other expenses are sought.

(Emphasis supplied.) OCGA § 50-14-5 (b).

It appears the court below awarded fees simply because the Board was in violation of the Act[1] and then reduced the award based upon a finding of a lack of bad faith on the Board's part. Upon remand, in determining whether to award fees, the court must first consider whether the Board's noncompliance with the Act was without, or "lacked," substantial justification. "Lacked substantial justification" has been defined in the attorney fees context as "substantially frivolous, substantially groundless, or substantially vexatious." See OCGA §§ 9-15-14 (b); 9-15-15 (a); 43-1-19 (f); *Munoz v. American Lawyer Media*, 236 Ga. App. 462, 466 (2) (512 SE2d 347) (1999). If the court determines the Board's noncompliance with the Act lacked substantial justification, it must award fees. The court may then reduce or eliminate the award completely, however, upon a finding of special circumstances that would, in the exercise of the court's discretion, justify such a decision.

*Judgment affirmed in part, reversed in part and remanded with direction. Johnson, P. J., and Ruffin, J., concur.*

DECIDED JUNE 6, 2001.

*Glen A. Cheney*, for appellant.

*Callaway, Neville & Brinson, William E. Callaway, Jr., William J. Neville, Jr.*, for appellee.

---

[1] OCGA § 50-18-73 (b), a comparable attorney fees provision in the Open Records Act, did at one time permit an award of fees to the prevailing party for noncompliance with its provisions. Ga. L. 1982, p. 1791, § 1. However, the legislature has since retreated from that position in both the Open Records Act (OCGA § 50-18-73 (b)) and the Open Meetings Act (OCGA § 50-14-5 (b)), at first mandating an award of fees where noncompliance was "completely without merit as to law or fact." Ga. L. 1988, p. 241, § 1; Ga. L. 1988, p. 250, § 4. Then, in 1992, the legislature modified both statutes to mandate fees only where the noncompliance was without substantial justification. Ga. L. 1992, p. 1063, § 4; Ga. L. 1992, p. 1067, § 9.