Filed 9/29/23  Friends of the Green Bridge v. Dept. of Transportation CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| FRIENDS OF THE GREEN BRIDGE, et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF TRANSPORTATION, <br><br> Defendant and Respondent. | A163405 <br><br> (Marin County Sup. Ct. No. CIV 1802702) |

In this environmental dispute, Friends of the Green Bridge and Robert A. Johnson (collectively, Friends) challenge the final environmental impact report (FEIR) for the Lagunitas Creek Bridge Project in Marin County prepared by lead agency and respondent California Department of Transportation (Caltrans).[1]  Friends assert that the FEIR was deficient because it failed to consider the possibility of a retrofit among its range of reasonable alternatives.  Friends further contend that Caltrans violated

---

[1] Caltrans is the lead agency for the project under both the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq. (CEQA)) and the National Environmental Policy Act (42 U.S.C. § 4321 et seq. (NEPA)).  All statutory references are to the Public Resources Code unless otherwise specified.  We refer to CEQA's implementing regulations (Cal. Code Regs., tit. 14, § 15000 et seq.) as "Guidelines" per common practice.        .

1

CEQA by failing to recirculate the draft environmental impact report (DEIR) prior to certification given that the FEIR contained significant new information. The trial court thoroughly and thoughtfully considered and rejected both of these arguments. As we agree with the trial court's analyses and conclusions, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Lagunitas Creek Bridge Project*

The Lagunitas Creek Bridge, locally called the Green Bridge, is located on State Route (SR) 1 in Marin County, just south of Point Reyes Station and north of the intersection with Sir Francis Drake Boulevard, approximately four-tenths of a mile east of the San Andreas fault. It serves as a vital connection between communities north and south of Point Reyes Station for residents, tourists, delivery trucks, emergency responders, transit providers, pedestrians, bicyclists, and equestrians. The bridge, which was built in 1929, is a three-span structure with a total length of 152 feet. It has two 26-foot reinforced concrete approach spans and a 100-foot riveted steel pony truss center span.

Lagunitas Creek originates on Mount Tamalpais in Marin County and flows approximately 22 miles into Tomales Bay. The Lagunitas Creek watershed is the largest sub-watershed draining into Tomales Bay. Environmentally sensitive habitat areas existing within the project footprint include wetlands, waters, riparian vegetation, and uplands that support a number of special-status or rare species, including coho salmon and steelhead.

The project was deemed necessary because the existing bridge does not meet current safety and seismic design standards. Indeed, deficiencies in the bridge would likely cause it to fail during a strong seismic event. Moreover,

the existing bridge and shoulders along SR 1 fail to provide continuous shared access for pedestrians, bicyclists, and equestrians.

## B.    *The Environmental Review Process*

After an inspection of the Lagunitas Creek bridge in 2008, Caltrans initially recommended certain measures to retrofit the bridge, such as filling the cracks on the deck to extend its life and strengthening the steel truss. However, by 2010, a life cycle cost analysis was completed for the bridge determining that it had, at most, a 20-year remaining life.  Given this fact— along with the conclusion that any sort of seismic retrofit work would add additional dead load to the structure, which already had a low live load carrying capacity[2]—Caltrans concluded that retrofitting the bridge was not a viable option.  A bridge inspection report in 2014 noted the bridge was "fracture critical" because it is a truss bridge with low redundancy.[3]

In March 2015, Caltrans submitted a Notice of Preparation to the California State Clearinghouse with respect to the bridge project.  Public notice regarding the project was posted, published, and sent to numerous governmental agencies and members of the public.  The notices indicated that the intent of the project is to ensure that the crossing of Lagunitas Creek on SR 1 in Point Reyes Station meets seismic safety standards and addresses the need for accommodating all users of the bridge.  The proposed plan was to replace the current bridge with a new bridge in one of four feasible types

---

[2] The structural elements supporting a bridge must be sufficient to support not only the weight of the bridge itself (dead load) but also the temporary weight of the traffic crossing the bridge (live load).

[3] Fracture critical components are "those steel members that are under tension and the failure of which (through corrosion or cracking) could result in collapsing a portion of or the entire bridge."  When a bridge lacks redundancy, if any key connection is compromised, the bridge could fail during an earthquake or heavy traffic loads.

meeting current Caltrans standards.  However, Caltrans invited the public to participate in the upcoming scoping process which would include a discussion of the "range of alternatives to be considered."  And the public was encouraged to "review preliminary design concepts" and provide comments, "particularly on the range of alternatives, resources, and impacts that should be considered" during the environmental review process.

### 1.    *Scoping Meetings*

At the initial public scoping meeting in March 2015, Caltrans reported that a structural assessment of the bridge disclosed that the steel portions of the bridge were deteriorating, reducing its design strength, and that the bridge did not meet current standards for earthquake resistance.  Caltrans presented an overview of the proposed replacement project, along with various project alternatives.  With respect to a possible retrofit of the existing bridge, Caltrans raised the following concerns: (1) retrofitting would require the addition of significant amounts of steel to strengthen the existing structure, decreasing the weight capacity of the bridge which was already less than the modern standard; (2) steel bridges are susceptible to fatigue which gives them a finite lifespan, making retrofitting not cost-effective at a certain point; and (3) since the depth and type of piles used for supporting the bridge was not documented, it was impossible to determine the ability of the current foundation to withstand seismic activity.  In connection with this discussion, Caltrans presented images of the bridge which showed cracked concrete and corroded metal components.  It also explained that keeping the current bridge design was problematic in that it did not meet modern bridge design standards with respect to lane width, shoulders, sidewalk width, and curb ramps for individuals with disabilities.  Caltrans sought public involvement in the project, requesting, among other things, suggestions for

4

new viable alternatives and ways in which the existing alternatives could be improved.

The comment period for the scoping process was extended from April 17 to June 20, 2015, and resulted in 78 comments.  Responders included regulatory agencies, businesses, private organizations, nonprofit groups, and members of the public.  Common themes among the comments included: keeping the construction period short to minimize impacts; continuing to investigate a retrofit alternative; maintaining the current character of the bridge; minimizing construction and design impacts on sensitive habitats and the species they support; minimizing impacts on adjacent property owners; conducting traffic safety analyses; and planning with sea level rise in mind.

One community member with bridge seismic design experience— Alistair Lizaranzu—commented in an April 2015 letter that, after reviewing the as-built drawings for the bridge and conducting a brief site visit, he saw "little information which would exclude a number of retrofit options." Moreover, in his experience, "only in exceptional cases did a trouble bridge merit a Replacement option over a Retrofit option."  After Caltrans arranged for a bridge engineer to speak with Lizaranzu, he sent a follow-up letter in June 2015 indicating that he had provided several examples of procedures typically used in Caltrans retrofit projects and reiterating that he believed a retrofit option "should be very carefully considered[] and could perhaps be implemented."  However, he acknowledged that whether a retrofit could be successful depended "almost entirely" on the "very tricky issue" of the existing pier connection to the existing piles as well as whether various interventions could be used effectively to limit forces transferred to the piers. Lizaranzu additionally noted his primary concern with respect to the project

5

was its possible impacts on the health and wellbeing of the salmon and steelhead in the creek.

Given the interest in a retrofit option expressed during the scoping period, a Caltrans bridge engineer prepared a memorandum in August 2015 to provide a reader-friendly review regarding existing conditions on the bridge and the feasibility of retrofit rather than replacement.[4]  The memorandum noted that commentors supporting a retrofit of the bridge were interested in reducing traffic delays, maintaining the existing scale and rural aesthetic of the bridge, shortening construction times to reduce economic impacts, and eliminating the need for property acquisition tied to creation of a temporary bridge.  The memorandum goes on to explain the deficiencies in each element of the bridge (abutments, t-beam spans, piers, pier piles, and steel truss span) and the type of retrofit each would likely require.

For example, with respect to the steel truss span, visual inspections of the trusses and floor beams had found a range of 1/8 to 1/2 inch of rust pack between a number of steel component surfaces and the connections between several components of the steel truss.  Many rivets also showed signs of corrosion.  Moreover, steel begins to fatigue and crack over time, and an ultrasound or radiographic inspection might find cracking or significant corrosion between steel components.[5]  In addition, the existing concrete deck is weathered and cracked, and maintenance records showed significant rust

---

[4] The memorandum stated it was not a technical engineering document but was intended to acquaint members of the public interested in the proposed project with the issues involved in the retrofit of an old steel truss bridge.  It also noted that Caltrans intended to continue its technical assessment of a retrofit alternative for the bridge project.

[5] Indeed, as discussed further below, a subsequent inspection using ultrasonic testing confirmed these preliminary concerns based on visual inspection.

6

buildup between the top flanges of the floor beams and concrete deck. Finally, the steel railing, at only several inches wide, "is completely ineffective against today's vehicular impact loading requirements."

Under these circumstances, each piece would need to be inspected to determine whether the steel cross section thickness had been reduced or was cracked, and then any deficient parts would need to be repaired or replaced for the loads they are meant to carry. This process would be even more complicated if steel plates were added to strengthen existing steel bridge components for seismic retrofit or increased traffic load capacity. There are also issues with replacing rusted rivets (which are no longer used) with larger, high-strength bolts. Moreover, the bridge would need to be closed or, at the least, limited to one-way traffic during this process. In addition, the concrete deck and floor beams would likely need to be completely replaced, during which time the bridge would be closed to traffic. Finally, replacement of the bridge safety rail with a rail meeting current safety standards would result in 10-foot lanes and no shoulders, rendering the retrofitted bridge functionally obsolete.

Another issue with the retrofit option raised in the memorandum is that the as-built plans do not document the depth, type, and capacity of the piles supporting the piers. Since "no feasible way exists to structurally assess the tensile, compressive, and lateral capacities of the piles without compromising portions of the bridge," retrofitting would likely involve "driv[ing] new piles of known capacity around the existing piers, which could then support a retrofitted pier."

After the initial scoping meeting, Caltrans began developing a range of possible alternatives for the project, including both replacement and retrofit options. It considered two construction methods—conventional and

accelerated bridge construction (ABC). "Use of ABC would shorten the construction duration to under 1 year, versus three years for conventional construction. [Caltrans] determined that, due to lack of redundancy [in the bridge] the retrofit alternative can only be developed with the conventional construction method."

Caltrans then held an additional informational meeting in October 2015 to respond to public comments. It noted that the purpose of the proposed project was "to provide a safe, seismically-stable crossing over Lagunitas Creek on Route 1 in Marin County." As Caltrans explained, the current bridge is seismically inadequate because: the piles are of unknown depth, which may have insufficient lateral and vertical support under earthquake loading; pier to substructure connections are inadequate for large seismic displacements; since there are no redundant structural elements, if any key connection is compromised the bridge could fail during an earthquake or heavy traffic loads; and possible large horizontal displacements of the steel trusses in an earthquake could cause them to fail. In addition to these seismic deficiencies, Caltrans described safety issues with respect to the current bridge, including travel lane width, lack of shoulders, and inadequate safety barriers. The presentation also contained a visual explanation of existing bridge deficiencies, including many of the problems described in the retrofit feasibility memorandum discussed above.

### 2. *SWG Meetings and Additional Studies*

Thereafter, under the theory that "public forums do not allow for efficient communication and collaboration," Caltrans established a Stakeholders Working Group (SWG) so that "project details could be conveyed and input could be meaningfully incorporated." Caltrans worked with a former Marin County supervisor to identify representatives from the

8

community to include in the group. It requested that the representatives be known and trusted spokespersons for existing community groups that represent the range of community interests, including business and tourism, farming and property ownership, safety and public services, community aesthetics, and environmental interests. Three SWG meetings were held from January to April 2016. Information discussed at the SWG meetings was condensed into two newsletters (March and June 2016) and distributed to the public.

Structure Maintenance & Investigations (SMI) convened a strategy meeting in August 2016 to consider retrofit versus replacement of the bridge. After detailing the deficiencies in the current bridge and considering planning studies for retrofit and replacement which had been developed for comparison purposes, the group unanimously recommended replacement. The fact sheet issued in connection with the meeting indicated that the estimated cost for the replacement alternative was $6.425 million, while the estimated cost for the retrofit alternative was $8.861 million. Both estimates included construction of a temporary bridge.

An additional report regarding corrosion of the existing bridge was completed in December 2016 using non-destructive ultrasonic testing and dry film thickness gauges, which use a magnetic principle to measure the thickness of coating on ferrous metals. While some of the representative locations tested showed more minor corrosion, the locations of faying surfaces where water appears to catch showed section losses exceeding 30 percent of designed member thickness. "In some cases, sufficient corrosion was present that member thickness was unmeasurable with [ultrasonic testing]." Based on a visual inspection, approximately four percent of bridge rivets appeared corroded.

In March 2017, Caltrans completed an additional seismic evaluation of the existing bridge, including a discussion regarding how it could be retrofitted to the performance level of " 'no collapse.' "  With respect to the 13-pile group deep foundations supporting each of the two piers, the analysis assumed 12-inch diameter circular timber piles because that was the standard pile type used when the bridge was constructed and there were no records detailing the type, length, and capacity of the existing piles.  According to the report, both longitudinal and transverse seismic events would result in: shearing of anchor bolts connecting the superstructure to the substructure; brittle failure of the abutment columns causing them to collapse; insufficient flexural capacity leading to large diagonal cracking in the unreinforced concrete piers which could result in brittle failure of the piers; failure of the pile to pile cap connection and plunging of the piles in liquefiable soil, which could lead to failure of the piers; and overstressing of the fracture critical truss members, which could cause failure of the truss.

Based on the findings in the seismic evaluation, a retrofit alternative would require replacement of the existing bearings, bridge deck, top flanges on all floor beams, gusset plates, expansion joints, guard rail, top and bottom plates of the top chords, bottom braces, all damaged rivets, and existing abutments, along with the construction of cast in steel shell (CISS) piles around the existing piles, new bent caps, a new concrete slab, and bridge rails.  The CISS piles could be constructed with a one-lane closure. Construction of the bent caps and abutments would require in-creek falsework, and jacking and temporary support would be needed to replace the existing pier and abutment bearings.  After reviewing the December 2016 corrosion report and the March 2017 seismic evaluation, SMI prepared

10

another fact sheet dated March 29, 2017, stating that its replacement recommendation had not changed.

Caltrans published an Alternatives Analysis Report (AAR) in April 2017 in response to the SWG's request for a screening of the full range of alternatives for possible inclusion in the upcoming environmental impact report (EIR). The AAR documented the alternatives analysis that had been conducted to that point and indicated that "[t]he alternatives development, refinement and analysis [would] continue throughout the environmental process, leading to selection of the preferred alternative." It also stated that "project alternatives are continually being refined to avoid and minimize impacts and reflect community context." For example, the concrete bridge alternative could incorporate a faux truss that could mimic the appearance of the existing bridge truss.

The ARR noted that a retrofit would require a three-year construction period,[6] rebuilding or removing and refurbishing many elements of the bridge, building a temporary detour bridge, and extensive in-creek support work that would require diverting creek waters. In addition, there would be no sidewalk improvements for bicycle or equestrian users or for individuals with disabilities. And, while the "look and scale" of the retrofitted bridge would be similar, the retrofit would result in several elements being enlarged to meet seismic requirements. "For example, the steel members would be thicker[,] and the piers and abutment foundations would be enlarged, while

---

[6] The long construction period is required due to "short allowable periods for in-water work (June to October) in order to minimize impacts on protected wildlife species, and because construction of a detour bridge would be required." Thus, for example, in the case of bridge replacement, one season would be needed to build the temporary bridge, a second season would be required for demolition of the existing bridge, and a third season would be used to build the new bridge and remove the temporary bridge.

11

the lanes would be narrowed to install protective railings needed for safety purposes." The ARR also states that the "primary difference" between the alternatives as to the amount of sensitive habitat affected is whether a temporary bridge would need to be built.

Caltrans and the SWG developed screening criteria in order to choose which alternatives would move forward for further consideration. Specifically, they considered whether an alternative would: meet the project purpose to achieve current safety and seismic requirements; be practical and feasible; minimize community impacts (minimize property acquisition, duration of construction, and degree of noise, dust, and visual blight during construction); and minimize environmental impacts (small construction footprint, least impact on water resources, minimize vegetation removal). After applying these criteria to the retrofit alternative, considering the "substantial deficiencies" in the structural integrity of the existing bridge, and noting "the uncertainty regarding the extensiveness of the efforts that would be necessary to complete the retrofit," the SWG did not support the retrofit alternative. First, unlike all of the replacement alternatives, the retrofit alternative would not meet the project's safety needs. Further, the retrofit alternative "would prove to be an extensive effort, result in comparatively higher environmental impacts than other alternatives under consideration, and not provide improvements for multimodal connectivity (such as pedestrians, bicyclists and equestrian users)."

More generally, the SWG unanimously concluded that "the conventional construction method requiring 3 years was not acceptable for the community's economic stability that greatly relies on tourism and movement of goods via SR 1. Additionally, the 3-year construction period would result in elongated impacts on the ecosystem and aesthetic values

surrounding the bridge site." It would also require construction of a temporary bridge alongside the current bridge with its resulting environmental impacts. The SWG recognized that the trade-off with the ABC method is complete closure of the bridge for a two-to-three-week period, with the most likely detour being approximately nine miles. Caltrans and the SWG reviewed measures to mitigate the impacts from such a closure and the SWG asked Caltrans to further explore whether and how any obstacles and hardships associated with the bridge closure could be resolved. Applying all of these considerations, three replacement alternatives requiring conventional construction were not carried forward for further environmental review, along with the retrofit alternative. Only one alternative with conventional construction (Alternative 2b) was carried forward in the environmental analysis "as a point of comparison against the alternatives using the ABC construction method and to disclose the full range of potential impacts associated with the project."

### 3. *Draft and Final EIRs and Related Documents*

Caltrans published the DEIR for the project in April 2017, reiterating the project purpose—"to provide a safe and seismically stable crossing of Lagunitas Creek on SR 1."[7] The proposed project "would replace the existing 152-foot-long, 34-foot-wide, three-span bridge with a new bridge that would have 11-foot wide northbound and southbound lanes and five-foot-wide

---

[7] The DEIR describes the many seismic deficiencies of the bridge as well as its failure to meet current safety standards. For example, with respect to safety concerns, the DEIR states that the existing bridge "was designed to carry trucks much smaller (e.g., 15-ton trucks) than present day trucks (e.g., 36-ton trucks). Thus, the bridge is not adequate for all modern-day truck loads. Although the bridge is only rated for smaller trucks, other trucks are known to use SR 1. There are no bridge rail barriers and if a truck was to drive into a truss, the structure may be compromised and fail."

13

shoulders on both sides. The new bridge would also accommodate one 6-foot-wide sidewalk on the west side of the bridge with railings or barriers to separate it from the shoulder and travel lanes. The sidewalk would accommodate shared access by pedestrians, bicyclists[,] and equestrians." The proposed project would be placed on the same vertical and horizontal alignments as the existing bridge as closely as bridge design and conditions allow.

The DEIR includes discussion of the following six alternatives: No-Build Alternative (Alternative 1); Three-Span, Short Steel-Truss Bridge, ABC, Longitudinal Move-In (Alternative 2a); Three-Span, Short Steel-Truss Bridge, Conventional Construction with Detour Bridge (Alternative 2b); Three-Span, Concrete Bridge, ABC, Longitudinal Move-In (Alternative 3a); Full-Span, Steel-Truss Bridge, ABC, Longitudinal Move-In (Alternative 4a); and Full-Span, Steel-Truss Bridge, ABC, Traverse Slide-In (Alternative 4b). It also discusses the retrofit option at some length under the heading "Alternatives Considered but Withdrawn for Further Consideration."[8] According to Caltrans, it might prepare additional environmental or engineering studies in response to comments on the DEIR. The FEIR would then include responses to comments and identify the preferred alternative.

The 45-day public review period for the DEIR was extended an additional two weeks to June 23, 2017. Caltrans held two public meetings to discuss the DEIR on May 10 and June 15, 2017. It received 392 comments, the majority of which were concerned about potential impacts on the nearby

---

[8] Other alternatives that were considered but not carried forward included a new bridge on a new alignment, three of the four bridge replacement options using conventional construction, and a suspension bridge.

14

animal hospital during construction. Many comments supported the no-build alternative, with the retrofit alternative as second choice.

On June 26, 2018, Caltrans issued an Addendum to the AAR in response to continued interest in a retrofit alternative. The Addendum expanded on the analysis of the retrofit alternative in the AAR, augmenting its discussion of the work that would be involved in a retrofit, including some possible alternatives for approaching a retrofit, and referencing a number of additional studies (including those discussed above) with respect to the state of the existing bridge. The Addendum reached the same conclusion as the AAR—that the retrofit alternative should not be advanced for full environmental review.

The FEIR with respect to the project was certified on June 29, 2018. Caltrans selected Alternative 3a—the three-span, concrete bridge, ABC, longitudinal move-in—as the preferred choice. Alternative 3a was selected primarily because: it is among the least environmentally impacting alternatives in terms of ground disturbance and property impacts during construction; it requires one of the smaller temporary construction easements on private property; it can be built quickly (less than one year); it is the narrowest among the alternatives; it does not detract from community character; it has the design with the least distraction of views toward the creek and of Point Reyes Station; it minimizes the duration and extent of environmental impacts to the aquatic habitat of Lagunitas Creek; and it has an open design that enhances line of sight for those turning onto SR 1 at the Sir Francis Drake Boulevard section. In addition, the inclusion of an

15

ornamental truss continues to be an option. The estimated construction cost for the preferred alternative is $8 million.[9]

Caltrans then adopted findings pursuant to section 21081. The findings identified the following significant impacts from the project: BIO-1 (wetlands and water of the U.S.); BIO-2 (aquatic habitat); BIO-3 (environmentally sensitive habitat areas); BIO-4 (species of special concern), and NOISE-1 (increased noise levels during construction). Enforceable mitigation measures were adopted to avoid or substantially lessen those significant impacts. Caltrans filed a Notice of Determination with respect to the project on July 2, 2018.

## C. *Court Challenge*

In August 2018, Friends commenced this mandamus action against Caltrans alleging several violations of CEQA. After briefing and argument, the trial court denied the petition for writ of mandate on June 15, 2021, rejecting all of Friends' claims. As is pertinent here, the court concluded that inclusion of a retrofit alternative in the DEIR was not required because there was no evidence such a retrofit would reduce adverse environmental impacts. Moreover, a retrofit would not achieve compliance with current safety standards. The court additionally found that there was a reasonable basis for Caltrans's selection of the alternatives it included in the EIR and that the EIR's discussion as to why a retrofit alternative was not advanced for further environmental review adequately informed the public as to the bases for its exclusion. With respect to recirculation, the court concluded that the additions to the FEIR did not constitute significant new information. Thus, recirculation was not required.

---

[9] The costliest alternative, at $12.6 million, was Alternative 2b, the only alternative using the 3-year conventional construction method.

16

This appeal followed.

## II. DISCUSSION

### A. CEQA Overview and Standard of Review

"An environmental impact report is an informational document," the purpose of which "is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (§ 21061.) As our Supreme Court has opined: "The purpose of an EIR is to give the public and government agencies the information needed to make informed decisions, thus protecting ' "not only the environment but also informed self-government." ' [Citation.] The EIR is the heart of CEQA, and the mitigation and alternatives discussion forms the core of the EIR." (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1162 (*Bay-Delta*).)

"A public agency must prepare an EIR or cause an EIR to be prepared for any project that it proposes to carry out or approve that may have a significant effect on the environment. [Citations.] The EIR must describe the proposed project and its environmental setting, state the objectives sought to be achieved, identify and analyze the significant effects on the environment, state how those impacts can be mitigated or avoided, and identify alternatives to the project, among other requirements." (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1197.) "The agency must notify the public of the draft EIR, make the draft EIR and all documents referenced in it available for public review, and respond to comments that raise significant environmental issues. [Citations.] The agency also must consult with and obtain comments from other agencies affected by the project and respond to their comments. [Citations.] It must

17

prepare a final EIR including any revisions to the draft EIR, the comments received from the public and other agencies, and responses to comments." (*Ibid.*)

"Much of what goes into an EIR is left to the discretion of the agency preparing it. The leading treatise summarizes: 'The lead agency has discretion to design the EIR and need not conduct every recommended test or perform all required research. [Citations.] An EIR is not required to address all of the variations of the issues presented. [Citation.] An analysis of every permutation of the data is not required.' " (*Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 726 (*Tiburon Open Space*); see *Laurel Heights Improvement Assn. v. Regents of University of California* (1998) 47 Cal.3d 376, 415 (*Laurel Heights I*) ["A project opponent . . . can always imagine some additional study or analysis that might provide helpful information. It is not for them to design the EIR. That further study . . . might be helpful does not make it necessary."].)

"The scope of judicial scrutiny proceeds along two paths. ' "Section 21168.5 provides that a court's inquiry in an action to set aside an agency's decision under CEQA 'shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' As a result of this standard, '[t]he court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.' [Citation.]" [Citation.] "We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable." [Citation.] [¶] "An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA

18

case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." [Citation.]' " (*Tiburon Open Space*, *supra*, 78 Cal.App.5th at p. 727.)

" 'The agency is the finder of fact and a court must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision. . . . "A court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so." [Citation.] "[T]he relevant inquiry here is not whether the record establishes compliance but whether the record contains evidence [the agency] *failed* to comply with the requirements of its . . . regulatory program. In the absence of contrary evidence, we presume regular performance of official duty. [Citation.]" ' [Citation.] [¶]. . . In other words, 'every court 'presumes a public agency's decision to certify the EIR is correct, thereby imposing on a party challenging it the burden of establishing otherwise.' " (*Tiburon Open Space*, *supra*, 78 Cal.App.5th at pp. 727–728.)

"Legal error, in the form of failure to comply with CEQA, is reviewed independently, but all factual determinations are reviewed according to the substantial evidence standard." (*Tiburon Open Space supra*, 78 Cal.App.5th at p. 728.) Under CEQA, "substantial evidence" is defined as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).) " 'The

19

substantial evidence standard is applied to conclusions, findings[,] and determinations.  It also applies to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions.' " (*Tiburon Open Space, supra*, 78 Cal.App.5th at p. 728.)

## B.     The EIR Included a Reasonable Range of Alternatives

### 1.     Applicable Law

"An EIR shall describe a range of reasonable alternatives to the project . . . which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project[] and evaluate the comparative merits of the alternatives." (Guidelines, § 15126.6, subd. (a).)  This requirement—that a lead agency select  "a reasonable range of potentially feasible alternatives"—is intended to "foster informed decisionmaking and public participation."  (*Ibid.*; see *Laurel Heights I, supra*, 47 Cal.3d at p. 404; *California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 276.)  A lead agency must publicly disclose the reasoning underlying its selection of alternatives.  (Guidelines, § 15126.6, subd. (a).)  However, "[t]here is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason," which requires an EIR "to set forth only those alternatives necessary to permit a reasoned choice."  (*Id.*, § 15126.6, subds. (a) & (f); see *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 566 ["CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR.  Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose."].)

"An EIR need not consider every conceivable project alternative or alternatives that are infeasible.  [Citations.]  Nor is it required to consider specific alternatives proposed by members of the public or other outside agencies.  [Citation.]  But it must consider 'a reasonable range of potentially feasible alternatives that will foster informed decisionmaking and public participation.' " (*Save Our Capitol! v. Department of General Services* (2023) 87 Cal.App.5th 655, 703.)

CEQA defines "feasible" as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors."  (§ 21061.1; Guidelines, § 15364.)  As stated above, however, "[a] 'feasible' *alternative* is one that could accomplish 'most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects.' (Guidelines, § 15126.6, subd. (a), italics added.)  We will uphold an agency's choice of alternatives unless they 'are manifestly unreasonable and . . . do not contribute to a reasonable range of alternatives.' " (*Tiburon Open Space*, *supra*, 78 Cal.App.5th at p. 741.)

### 2.    *Analysis*

Friends argue that Caltrans's failure to analyze a retrofit option in the EIR violated CEQA's mandate that the agency assemble a range of alternatives sufficient to engender informed decision making.  Specifically, they assert: that a retrofit alternative is the "most obvious" alternative to replacement; that it is clearly potentially feasible; that it satisfies basic project objectives; that it could avoid or lessen significant environmental effects; and that its exclusion compromised CEQA's goal of informed decisionmaking.  We disagree.

21

Preliminarily, that an alternative may be superficially "obvious" does not mandate its inclusion in an agency's range of alternatives. Nor does the fact that members of the public desired a retrofit alternative undercut Caltrans's decision to exclude it from further environmental review. Moreover, while we agree with Friends that a retrofit might be potentially feasible in the general sense of the word—i.e., capable of being accomplished—that does not mean it is potentially feasible for CEQA purposes or that it should have been included among the EIR's range of alternatives as we discuss further below.

As for whether a retrofit alternative would accomplish most of the basic objectives of the project, we disagree with Friends that the administrative record establishes that the only purpose of the project was to make the bridge seismically stable, and that Caltrans tried to "slip in" additional objectives related to safety late in the process to justify its decision to reject a retrofit alternative. To the contrary, at least one of the initial public notices during the scoping period stated that the intent of the project was to ensure that the crossing of Lagunitas Creek on SR 1 in Point Reyes Station meets seismic safety standards and addresses the need for accommodating all users of the bridge. Moreover, at the first scoping meeting in March 2015, Caltrans explained that keeping the current bridge design was problematic in that it did not meet modern bridge design standards with respect to lane width, shoulders, sidewalk width, and curb ramps for individuals with disabilities. And these issues were reiterated at the second scoping meeting in October 2015, where the purpose of the project was declared to be "to provide a *safe*, seismically-stable crossing over Lagunitas Creek on Route 1 in Marin County." (Italics added.) This purpose was carried forward into the FEIR, and clearly includes more than safety solely from a seismic standpoint as

22

Friends contend.  For example, the AAR identified "meeting safety standards" as one of the screening criteria for inclusion of alternatives in the DEIR and noted, in determining not to advance a retrofit alternative, that it was the only alternative that would not meet the project's safety needs.

Friends also fault Caltrans for failing to "perform the work" to remove the uncertainty involved in a bridge retrofit before making its decision to exclude a retrofit alternative from the EIR.  However, substantial evidence exists in the record that there is significant uncertainty in a retrofit option that cannot be dispelled, especially with respect to the state of the existing piles.  The August 2015 memorandum discussing the retrofit alternative noted that "no feasible way exists to structurally assess the tensile, compressive, and lateral capacities of the piles without compromising portions of the bridge."  And, as stated in the FEIR:  "There are no available construction plans documenting the piles from the original construction so the piles supporting the bridge are of unknown type and depth.  In addition, their condition after 89 years of use and exposure to water is unknown because they are buried and cannot be inspected."  Uncertainty is also inherent in any project where elements must be taken apart and inspected before the scope of the retrofit effort can be fully appreciated.

Friends next contend that the "constant public pushback" requesting a retrofit option shows that Caltrans's approach prevented informed public participation and decision making.  And they ascribe nefarious motives to Caltrans for its "unusual maneuvers" in continually providing "after the fact" justifications for its exclusion of a retrofit option up and until the FEIR's certification in June 2018.  We do not view the record this way.  Rather, as early as the August 2015 retrofit feasibility memorandum, Caltrans indicated that it intended to continue its technical assessment of a retrofit alternative.

Caltrans later stated it might prepare additional environmental or engineering studies in response to comments on the DEIR. Given the significant public interest in the retrofit option, we find it eminently reasonable that Caltrans would continue to study the matter throughout the environmental review process and in response to comments it received. And, while the additional studies may not have supported the retrofit option some members of the public hoped for, it cannot be said they did not contribute to informed public participation and decisionmaking.

In the end, Friends really seem to be arguing that there is some objectively "true" or "legitimate" retrofit option out there which Caltrans has not considered or discussed and which would lessen environmental impacts while meeting project goals. But there is no evidence in the record that suggests such a reduced-impact retrofit was possible, and substantial evidence exists in the record supporting a conclusion that it was not. As CEQA declares: "[I]t is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives . . . which would substantially lessen the significant environmental effects of such projects . . . . [T]he procedures required by this division are intended to assist public agencies in systematically identifying . . . the feasible alternatives . . . *which will avoid or substantially lessen such significant effects.*" (§ 21002, italics added.)

Thus, as stated above, the EIR need only describe a "range of reasonable alternatives to the project . . . which would *feasibly* attain most of the basic objectives of the project but *would avoid or substantially lessen any of the significant effects of the project.*" (Guidelines, § 15126.6, subd. (a).) And "feasible" for CEQA purposes means capable of successful accomplishment "within a *reasonable period of time, taking into account*

24

*economic, environmental, social, and technological factors.*" (§ 21061.1; Guidelines, § 15364, italics added.) At bottom, Friends cannot establish Caltrans erred in excluding a retrofit alternative from the EIR because substantial evidence supports the conclusions that a retrofit would not lessen environmental impacts and could not be completed in a reasonable amount of time based on community constraints.

As mentioned above, when determining which alternatives should be analyzed in the DEIR, the SWG unanimously concluded that "the conventional construction method requiring 3 years was not acceptable for the community's economic stability that greatly relies on tourism and movement of goods via SR 1. Additionally, the 3-year construction period would result in elongated impacts on the ecosystem and aesthetic values surrounding the bridge site." It would also require construction of a temporary bridge alongside the current bridge with its resulting environmental impacts. For these reasons, three replacement alternatives requiring conventional construction were not carried forward for further environmental review, along with the retrofit alternative which also required conventional construction. One alternative with conventional construction (Alternative 2b) was carried forward in the environmental analysis "as a point of comparison against the alternatives using the ABC construction method and to disclose the full range of potential impacts associated with the project." It was not unreasonable for Caltrans to use Alternative 2b as the point of comparison rather than the retrofit option, as Alternative 2b met all the project needs while a retrofit would not. And, as stated in the FEIR, "[w]hile Alternative 2b is the only alternative evaluated with conventional construction, the impacts would be comparable if conventional construction were performed with any of the bridge types."

25

Friends do not deny that a retrofit option was most similar to Alternative 2b. Nor do they dispute that it would require a three-year conventional construction period, including the installation and demolition of a temporary bridge. And substantial evidence supports these conclusions. As such, Caltrans would have been justified in deeming a retrofit option infeasible because it could not be completed within a reasonable period of time, considering both the uncertainties inherent in a retrofit and the economic impacts a three-year construction period would have on the community, which relies so heavily on tourism.

Moreover, Friends' cursory claims to the contrary notwithstanding,[10] it is clear that a retrofit alternative spanning three years and requiring creation of a temporary bridge would increase rather than decrease environmental impacts, which is why both the community and environmental regulatory agencies "strongly oppose" conventional construction. Indeed, most of the alternatives using conventional construction were removed from consideration due to "[l]asting noise, air quality, and debris effects" and "[p]rolonged disturbance of the sensitive habitats that support threatened and endangered species associated with Lagunitas Creek."

As just one example, with respect to impacts on habitats for threatened and endangered species, Alternative 2b's impacts were deemed similar to alternatives using ABC such as 2a and 3a, "except a larger amount of upland

_____

[10] Friends argue, for example, that a retrofit would lessen noise impacts because it would not require demolition of the bridge and vibratory pile driving, but they ignore the facts that construction and demolition of the temporary bridge would be necessary under a retrofit alternative; that pile driving would be required to construct the temporary bridge; that a bridge retrofit would also require the installation of new piles given the uncertainty surrounding the existing piles; and that extensive in-water support of the existing bridge would be required.

area would be impacted and the additional piers in the water for the building of a temporary detour bridge would have greater effects on the aquatic species (tidewater goby, Chinook salmon, steelhead, coho salmon, green sturgeon, [California red-legged frog], and [California freshwater shrimp]). Grading, clearing, and advance tree removal of upland areas that are not restored within 1 year of impact are considered permanent impacts. The longer duration of construction could directly affect [California red-legged frog] breeding and foraging activities within the project footprint and would increase the potential for take of all of the aquatic species. The 3 years of dewatering activities would increase the potential for take of threatened and endangered aquatic species." A review of Table S-3 comparing project impacts shows a number of additional increased impacts for Alternative 2b due to the three-year construction period and temporary detour bridge. It is reasonable to assume that the environmental impacts with respect to a retrofit would be at least as great as those ascribed to Alternative 2b and could be even greater due to the additional in-water work required to support the existing bridge during a retrofit effort.[11]

In sum, substantial evidence supports Caltrans's decision to withdraw a retrofit alternative from further consideration. Under such circumstances,

---

[11] *Watsonville Pilots Assn. v. City of Watsonville* (2010) 183 Cal.App.4th 1059, cited by Friends, is distinguishable on this basis. There, the EIR for the city's general plan improperly rejected a reduced growth alternative because it would not have achieved *all* of the project's objectives. (*Id.* at pp. 1087–1088.) The appellate court concluded that the reduced growth alternative should have been included because it would have "provided the decision makers with information about how *most* of the project's objectives could be satisfied *without the level of environmental impacts* that would flow from the project." (*Id.* at p. 1090, italics added.) Here, in obvious contrast, not only would a retrofit fail to achieve all of the project's objectives, but it would also fail to decrease the project's environmental impacts.

27

Caltrans's selection of alternatives for analysis in the EIR was not manifestly unreasonable, providing as it did a range of feasible replacement options for consideration. Friends has failed to meet its burden of proving otherwise.

## C.    *Recirculation was not Required*

Friends also argue that Caltrans violated CEQA by failing to recirculate the EIR for additional public review before certification, despite adding " 'significant new information' " in the FEIR and Addendum that was very important to the public. Friends accuse Caltrans of trying to "slip this information into the record at the eleventh hour to justify its premature and unsupported decision to exclude every seismic retrofit approach from the EIR." Under such circumstances, Friends allege, failure to recirculate the EIR was a "clear" abuse of discretion. We are not persuaded.

### 1.    *Additional Background*

As mentioned above, the DEIR discussed and rejected the possibility of a retrofit alternative for the bridge, determining it was not feasible. Specifically, the DEIR explained:

"Caltrans explored the possibility of retrofitting the existing bridge as an alternative to bridge replacement. According to the Seismic Evaluation of Lagunitas Creek Bridge (Caltrans 2017), many elements of the bridge are extremely vulnerable to failure during a seismic event. See Section 1.2.2, Project Need, for details about the current condition of the bridge. Caltrans structural engineers explored the methods for retrofitting the bridge and learned that retrofitting the bridge would require the following:

· As explained in Section 1.2.2, Project Need, there are existing bridge deficiencies associated with the piles, piers, and abutments, as well as the truss itself. Virtually each major structural element[] of the bridge

28

would require reinforcement, replacement, or refurbishing.  This effort would be unpredictable and could have unforeseen delays.

- An extensive support structure would have to be built under the bridge to support the bridge during the dismantling and restoration process. Working on reinforcements to the piers and abutments would require removing the bridge deck and T -spans.  The presence of thick rust in the truss would require removing gusset plates and thickening the steel members to meet current seismic requirements.  Without truss members, the bridge deck could not be supported.  The existing bridge does not have redundancy in the structure; therefore, as the bridge is dismantled to be retrofitted, the structure would have to rely on a massive temporary support structure built under and within Lagunitas Creek to avoid collapse.

- A support structure would be difficult to construct and remove within the limited allowable in-water work period mandated by the federal Endangered Species Act to protect threatened and endangered species. A creek water diversion would be necessary.  Due to the amount of development on three corners of the bridge, a creek diversion would require relocating a business and/ or residence, large impacts on extensive riparian habitat, as well as substantial changes to Whitehouse Pool Park.  As remarked previously, Section 4(f) requires that federally funded projects avoid parklands if there are feasible and prudent alternatives to do so.  A creek water diversion has the potential for substantial impacts on protected species and their habitat due to destruction of habitat, large amounts of siltation from new water course, and a narrower channel that would change the water velocity. The regulatory agencies would resist permitting a project that would

result in substantial environmental impacts to protected aquatic species if other alternatives with less impact are equally feasible.

- A temporary detour bridge would be necessary to safely maintain circulation during construction for the following reasons:
  - There is not enough room on the bridge for both construction workers and moving vehicles, creating safety issues for drivers and workers during the retrofit.
  - The temporary support structure would have to be strong enough to carry both the weight of the existing bridge and the weight of passing vehicles, which together are heavier than the requirements for the final retrofit bridge.
  - The retrofit would require removing the bridge deck and truss elements, not only to replace or refurbish but also to access and strengthen the piers and abutments.

"Finally, the retrofit would not resemble the existing bridge because the steel members would be thicker, the piers and abutment foundations would be enlarged, and the lanes would be narrower in order to accommodate the required protective railings. Narrowing the lanes would not be in compliance with Caltrans safety design standards. There would be no improvements to sidewalks for bicycle, pedestrian, or equestrian users. The current sidewalk conditions do not meet [federal disability] requirements, and under the retrofit alternative, this lack of compliance would continue.

"Because the retrofit alternative would be an extensive effort, would result in comparatively much higher environmental impacts (including use of park land and adverse effects on special status species) than other alternatives under consideration, [and] would not provide improvements for multimodal connectivity (such as pedestrians, bicyclists, and equestrian

30

users), this alternative was not carried forward into further environmental review."

After issuing the DEIR, Caltrans received 392 comments (332 from members of the public). One of the common requests in the comments was that Caltrans review a range of retrofit alternatives or a " 'less intensive' " retrofit alternative. In response, Caltrans released the Addendum to the Alternative Analysis Report on June 26, 2018, which, among other things, "refin[ed] the definition of and efforts associated with the retrofitting of the bridge (including optional approaches to retrofit the bridge)." The conclusions in the April 2017 Alternatives Analysis Report did not change. Rather the Addendum supplied "some expanded details, clarifications, and supporting data."

Although several different options exist for retrofitting both the superstructure and the substructure, all retrofit approaches would "require a similar level of effort and would result in similar environmental impacts." Specifically, all retrofit alternatives would require at least a three-year-long construction period; have greater environmental impacts than the replacement alternatives due to impacts in the creek channel from more supports during construction; require installation of a safety barrier which would narrow roadway width and eliminate the shoulder, making the roadway substandard; and require "substantial effort (replace substantial number steel truss members; contain and remove lead paint on all members that are contacted in the replacement process)."

After considering comments on the DEIR and releasing the Addendum, Caltrans certified the FEIR in June 2018. The section in the FEIR describing why the retrofit alternative was removed from further consideration provides as follows:

31

"Caltrans considered the possibility of retrofitting the existing bridge as an alternative to bridge replacement. A retrofit alternative is proposed when the current structure has deficiencies that can be repaired without full replacement. The seismic risk to the bridge is detailed in several studies completed by Caltrans available on the project's website (http://www.dot.ca.gov/d4/lagunitascreekbridge/). According to the Seismic Evaluation of Lagunitas Creek Bridge (Caltrans 2017a), many elements of the bridge are vulnerable to failure during a seismic event. See Section 1.2.2, Project Need, for details regarding the current condition of the bridge.

"As explained in Section 1.2.2, there are existing bridge deficiencies associated with the piles, piers, and abutments, and severe corrosion on the steel truss itself, particularly on fracture-critical components.[] According to the Investigation of Corrosion of Lagunitas Creek Bridge No. 27 0023, CA Route 1 PM 28.1 (Caltrans Office of Structural Materials 2016), virtually each major structural element of the bridge would require reinforcement, replacement, or refurbishing. In addition to the prolonged time required to replace these corroded components, this repair option is complex and would require a substantial temporary support structure (to hold the superstructure while dismantling, needed due to the lack of redundancy in the superstructure) underneath the truss at the bottom connections and adjacent nodes. A temporary support structure poses greater risks to the bridge because the additional weight of the support structure would result in the need for a larger substructure (pier and abutment retrofit) for the bridge. Collectively, these would cause greater environmental impacts than the comparable alternatives under evaluation. Furthermore, the lack of redundancy in the bridge structure and the narrowness of the bridge prevent both construction workers and motorists from being on the bridge while work

is being performed on the truss.  Due to these factors, a retrofit effort would be unpredictable and could have unforeseen delays and is generally not a prudent use of resources relative to the limited lifespan that can be achieved through a retrofit effort.

"In addition, Caltrans has determined that meeting its Highway Design Manual 'no collapse' criteria for a retrofit of the Lagunitas Creek Bridge would entail a substantially larger effort (in light of the higher than expected corrosion findings throughout the steel truss members) than the replacement Build Alternatives, involving at least 3 years of construction, and a detour bridge that would increase the area and duration of environmental impacts.

"Finally, in addition to the primary seismic concerns, the retrofit would not meet the safety elements that the replacement alternatives would.  As noted previously, even without the seismic vulnerabilities, the current truss is vulnerable to potential collapse if a vehicle were to have a collision with either side of the truss.  Under a retrofit scenario, a safety barrier is required to be installed to deflect vehicles from colliding into the non-redundant truss structure.  This would reduce the travel way by 3 to 4 feet, which would remove the 2-foot shoulders.  Safety research has shown a high correlation between narrow lanes and increased risk of accidents on rural two-lane highways (FHWA 2000).  Finally, it does not fulfill Caltrans' Deputy Directive 64-Rl Complete Streets–Integrating the Transportation System, which states that the needs of users of all ages and abilities must be met, [including] safe non-motorized accessibility elements.  Therefore, this alternative was not carried forward for further environmental review."
(Italics omitted.)

### 2. *Applicable Law*

An EIR must be recirculated if "significant new information" is added after issuance of the draft EIR and prior to certification of the final EIR. (§ 21092.1; Guidelines, § 15088.5, subd. (a).) Recirculation requires making the revised EIR available for public review and consulting with other agencies again before certification. (*Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 631; Guidelines, § 15088.5, subd. (d).) "[N]ew information is 'significant,' within the meaning of section 21092.1, only if as a result of the additional information 'the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a *substantial* adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect.' [Citations.] Recirculation is not mandated under section 21092.1 when the new information merely clarifies or amplifies the previously circulated draft EIR, but is required when it reveals, for example, a new substantial impact or a substantially increased impact on the environment." (*East Oakland Stadium Alliance v. City of Oakland* (2023) 89 Cal.App.5th 1226, 1265 (*East Oakland Stadium Alliance*), quoting *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 447.)

The Guidelines provide the following as examples of "significant new information" requiring recirculation: "(1) A new significant environmental impact would result from the project or from a new mitigation measure proposed to be implemented. [¶] (2) A substantial increase in the severity of an environmental impact would result unless mitigation measures are adopted that reduce the impact to a level of insignificance. [¶] (3) A feasible project alternative or mitigation measure considerably different

from others previously analyzed would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it.  [¶]  (4) The draft EIR was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded."  (Guidelines, § 15088.5, subd. (a).)

" ' "[T]he final EIR will almost always contain information not included in the draft EIR" given the CEQA statutory requirements of circulation of the draft EIR, public comment, and response to these comments prior to certification of the final EIR. . . .  "[R]ecirculation was intended to be an exception, [not] the general rule." ' " (*Southwest Regional Council of Carpenters v. City of Los Angeles* (2022) 76 Cal.App.5th 1154, 1184.) While the lead agency is not required to make an express finding regarding recirculation of an EIR, the decision not to recirculate must be supported by substantial evidence in the record.  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1133 (*Laurel Heights II*); Guidelines, § 150885, subd. (e).)  We presume the lead agency's decision is correct.  Plaintiffs bear the burden of showing that no substantial evidence supports the agency's determination that the new information disclosed in the final EIR was not significant new information.  (*Western Placer Citizens for an Agricultural and Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 903.)  We resolve reasonable doubts in favor of the lead agency's decision. (*Laurel Heights II*, at p. 1135.)

### 3.    *Recirculation was not Required*

As stated above, new information is generally significant for recirculation purposes only if " 'as a result of the additional information "the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a *substantial* adverse environmental effect of the project or

35

a feasible way to mitigate or avoid such an effect." ' " (*East Oakland Stadium Alliance, supra,* 89 Cal.App.5th at p. 1266.)  The bulk of the examples of "significant new information" in the Guidelines similarly involve new significant impacts, a substantial increase in severity of an environmental impact, or a failure to adopt a new alternative or mitigation measure that would lessen significant environmental impacts.  (Guidelines, § 15088.5, subd. (a).)  Since Caltrans's decision not to advance a retrofit alternative does not fall within any of these categories, Friends are left with the argument that, due to its failure to analyze a retrofit alternative, "[t]he draft EIR was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded." (Guidelines, § 15088.5, subd. (a)(4).)  Citing *Sutter Sensible Planning, Inc. v. Board of Supervisors* (1981) 122 Cal.App.3d 813 (*Sutter*) and suggesting we examine for ourselves the many changes made from the DEIR/ARR to the FEIR/Addendum, Friends claim that the DEIR's retrofit discussion amounted to "conclusory statement[s] 'unsupported by empirical or experimental data, scientific authorities, or explanatory information of any kind.' " (*Id.* at p. 820.)  This is a hard mountain to climb, and Friends fail to reach the summit.

Our examination of the discussion of a possible retrofit alternative in the DEIR/ARR discloses: many elements of the existing bridge are vulnerable to seismic failure; virtually each major structural element of the bridge would require reinforcement, replacement, or refurbishing; a retrofit would be unpredictable; a significant support structure would be needed under the bridge during the restoration process; a retrofit would have greater environmental impacts; *a support structure would be difficult to remove within the limited allowable in-water work period mandated by*

36

*federal law and would require a creek water diversion with its attendant impacts*[12]; a temporary bridge and three-year construction period would be required; retrofit would enlarge several of the bridge elements; necessary protective rails would narrow the lanes, which would not comply with current safety standards; and a retrofit would not include improvements for multimodal connectivity.

According to the FEIR/Addendum's retrofit discussion: many elements of the existing bridge are vulnerable to seismic failure; virtually each major structural element of the bridge would require reinforcement, replacement, or refurbishing; *although several different options exist for retrofitting both the superstructure and the substructure, all retrofit approaches would "require a similar level of effort and would result in similar environmental impacts"*; a retrofit would be unpredictable; a significant support structure would be needed under the bridge during the restoration process; *a retrofit is not a prudent use of resources due to the relative lifespan of the bridge*[13]; a temporary bridge and three-year construction timeframe would be required; a retrofit would have greater environmental impacts; required protective rails would narrow the lanes, which would not comply with current safety standards; and a retrofit would not include improvements for multimodal connectivity.

As is readily apparent, while the FEIR/Addendum provided some additional information and analysis regarding a retrofit, their discussion

---

[12] While this statement was not included in the FEIR, the Addendum makes clear that its deletion did not change the EIR's conclusions regarding creek diversion.

[13] The limited lifespan of the bridge and the fact that a retrofit would be more costly were discussed throughout the environmental review process and thus were not new information.

of the retrofit alternative was not significantly different from that in the DEIR/ARR, and they reached the same conclusions. Any additional information/analyses merely clarified, amplified, or made insignificant modifications to an otherwise adequate EIR. (Guidelines, § 15088.5.) The myriad claims asserted by Friends do not convince us otherwise.

For example, Friends contend that Caltrans, for the first time, tied the corrosion of the truss to the infeasibility of a retrofit in the FEIR. But Caltrans highlighted the corrosion of the bridge truss from the first scoping meeting in March 2015 as well as in the August 2015 retrofit feasibility memorandum. The later corrosion study cited in the FEIR merely confirmed Caltrans's initial analysis based on visual inspection through the use of ultrasonic testing.

Friends also argue that the FEIR relied on the "speculative assertion" that the steel truss might collapse if hit by a vehicle to explain the need for a new safety barrier, which would make a retrofit problematic. But the fact that the bridge truss was "fracture critical" due to its lack of redundancy was discussed as early as 2014 in a bridge inspection report. And the August 2015 retrofit feasibility memorandum noted that the steel railing, at only several inches wide, "is completely ineffective against today's vehicular impact loading requirements," and that replacement of the bridge safety rail with a rail meeting current safety standards would result in 10-foot lanes and no shoulders, rendering the retrofitted bridge functionally obsolete. That new protective railings would be required was then discussed at the October 2015 scoping meeting, in the March 2017 seismic evaluation, in the AAR, and in the DEIR. Based on the known facts regarding the existing bridge and a comparison with current safety standards, this was a reasonable (nonspeculative) assumption.

Next, Friends again point to Caltrans's failure to fully investigate the condition of the bridge's piles as evidence of the inadequacy of its technical analysis of the retrofit alternative. But as we have already determined, substantial evidence supports the conclusion that the actual condition of the piles was unknowable. Friends also highlight the statement in the Addendum that a retrofit of the bridge's substructure could be accomplished "by strengthening the existing piers and abutments, or drilling new large diameter pilings to strengthen the existing abutments or piers," arguing that it "directly contradicted" Caltrans's representation that it was impossible to determine the condition of the existing foundation. This is just untrue. The strategies discussed for retrofitting the piers and abutments both require new piles (either constructed around the piers or drilled in and around the abutments) precisely because the strength of the existing foundation is unknown.

Finally, Friends assert that the different strategies for a retrofit discussed in the Addendum were critical new information. We disagree. The Addendum does discuss various retrofit strategies but states that "retrofit approaches that meet the 'no collapse' [design] criteria would *all* require a similar level of effort and would result in similar environmental impacts," specifically a three-year construction period, rebuilding, removing, or refurbishing many elements of the bridge, construction of a temporary bridge, and extensive in-creek work. (Italics added.) Thus, these new retrofit variations provide no basis for challenging Caltrans's decision to remove a retrofit alternative from further consideration.[14]

---

[14] In one paragraph at the end of their recirculation discussion, Friends summarily assert that the FEIR includes previously undisclosed impacts to essential fish habitat and protected species. They fail to support their citations to the record with any argument as to why the identified passages

This case is easily distinguishable from *Sutter*, *supra*, 122 Cal.App.3d 813, cited by Friends. In *Sutter*, a draft EIR for a proposed tomato paste processing plant failed to discuss adequately a number of significant project impacts related to groundwater levels, traffic, and wastewater disposal. (*Id.* at pp. 816–817.) The board of supervisors referred the final EIR back to the Planning Department for a "redraft" after several board members deemed it inadequate and unlikely to survive judicial review. (*Id.* at p. 821.) "The revised final EIR 'fundamentally' reorganized the previous information and provided a substantial amount of new information, including additional details about the potential effects of the plant on the environment and substituting some new data for information which had been repudiated by its purported author." (*Laurel Heights II, supra*, 6 Cal.4th at pp. 1127–1128 [explaining *Sutter*].)

The *Sutter* court "determined that recirculation for public comment would be an appropriate procedure to follow in the situation where 'significant new information' is added to an EIR after the close of the public comment period, but *prior* to certification." (*Laurel Heights II*, *supra*, 6 Cal.4th at p. 1128.) In doing so, the appellate court noted the importance under CEQA of public comments and agency statements in response to comments, stating: " [T]he requirement of a detailed statement helps [e]nsure the integrity of the process of decision by precluding stubborn problems or serious criticism from being swept under the rug. A conclusory statement 'unsupported by empirical or experimental data, scientific authorities, or explanatory information of any kind' not only fails to

require recirculation and have therefore waived this claim. (*Friends of the Eel River v. Sonoma County Water Agency* (2003) 108 Cal.App.4th 859, 877.) Regardless, our review of the record shows no basis for recirculation on these grounds.

crystallize issues [citation] but 'affords no basis for a comparison of the problems involved with the proposed project and the difficulties involved in the alternatives.' " (*Sutter*, *supra*, 122 Cal.App.3d at p. 820.) Thereafter, our Supreme Court cited *Sutter* as a case in which the "draft EIR [was] fundamentally and basically inadequate in many respects." (*Laurel Heights II*, *supra*, 6 Cal.4th at p. 1131.) Thus, *Sutter* was the type of proceeding where recirculation was required because "the draft EIR was so fundamentally and basically inadequate and conclusory in nature that public comment on the draft was in effect meaningless." (*Id.* at pp. 1130–1131.)

Here, in contrast, Friends have resoundingly failed to establish that the DEIR/ARR consisted of "conclusory statement[s] 'unsupported by empirical or experimental data, scientific authorities, or explanatory information of any kind' " (*Sutter*, *supra*, 122 Cal.App.3d at p. 820) or was "fundamentally and basically inadequate" (*Laurel Heights II*, *supra*, 6 Cal.4th at p. 1131). Nor do the FEIR/Addendum include significant new information as defined by CEQA. Thus, recirculation was not required.

We truly appreciate the attachment many members of the community have to this historic bridge. However, safety and accessibility are valid (and in this instance countervailing) governmental concerns. Our independent review of the record reveals that Caltrans consistently engaged and included the public in consideration of a retrofit option throughout the environmental review process. And we have concluded that substantial evidence supports Caltrans's decision to remove a retrofit option from further environmental review. Nothing more was required.

## III.  DISPOSITION

The judgment is affirmed.  In the interests of justice, the parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)

BOWEN, J.*

WE CONCUR:


HUMES, P. J.


MARGULIES, J.


A163405N

---

* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

43